$$\$2{,}000 \div (17 \times 7\% + 1) = \$913.24, \text{ present worth.}$$
$$\$2{,}000 \div (18 \times 7\% + 1) = \$884.96, \text{ present worth.}$$
$$\$2{,}000 \div (19 \times 7\% + 1) = \$858.37, \text{ present worth.}$$

At the date of issuance, the present worth of these policies was $2,656.57. At the time of death, 34 days later, the present worth had increased by $17.55. The application of this rule will reduce the amount of the judgment, and to that extent the judgment will be modified; in all other matters the judgment is affirmed. The case will be remanded to the District Court, with directions to enter judgment in favor of the appellee for the sum of $2,-674.12, the present worth of the policies.

## COMMISSIONER OF INTERNAL REVENUE v. OHIO FALLS DYE & FINISHING WORKS.

### No. 5638.

Circuit Court of Appeals, Sixth Circuit.

June 13, 1931.

Helen R. Carloss, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, C. M. Charest, and R. N. Shaw, all of Washington, D. C., on the brief), for petitioner.

Chester A. Gwinn, of Washington, D. C. (Humphreys & Gwinn, of Washington, D. C., on the brief), for respondent.

Before DENISON, HICKS, and HICKENLOOPER, Circuit Judges.

DENISON, Circuit Judge.

The Commissioner levied a deficiency assessment against the Ohio Falls Works; upon appeal to the Board, the assessment was set aside becaused barred by the five-year limitation; and the Commissioner in this appeal relies upon a statutory exception to that limitation. The controversy turns upon the interpretation of this exception.

The normal limitation would expire on June 14, 1924; and the deficiency assessment in question was made August 5, 1926. The

Revenue Acts of 1924 and 1926 are alike, in that they provide as follows:

"Sec. 277. (a) Except as provided in section 278 * * * The amount of income, excess-profits, and war-profits taxes * * * shall be assessed within five years after the return was filed." 26 USCA § 1057 and § 1057 note.

"Sec. 278 * * * (b) Any deficiency attributable to a change in a deduction tentatively allowed under paragraph * * * (8) of subdivision (a) of section 234, of 'the Revenue Act of 1918 or the Revenue Act of 1921, may be assessed * * * at any time." 26 USCA § 1059.[1]

(8) of section 234 (a) of each act, (40 Stat. 1077, 42 Stat. 254) provided, in substantially equivalent terms, that upon buildings and equipment constructed or acquired after April 6, 1917, for war-manufacturing purposes, there should be allowed to the taxpayer a reasonable deduction for the amortization of the cost thereof.

Whether there had been, in this case, such a "deduction tentatively allowed" under this paragraph (8) as to permit the resulting deficiency to be assessed at any time, is the controlling question. Since the five-year statute had not run on June 2, 1924, when the Revenue Act of 1924 took effect, no question arises as to whether the bar of the statute which has once become applicable, can later be removed.

The taxpayer filed, on June 14, 1919, its return for the year 1918. It deducted on account of this amortization about $28,000, and thereby correspondingly lessened the amount of the income and war and excess profits taxes otherwise payable. It is to be assumed that, in due course and pursuant to the regulations (article 1012, T. R. 45, infra, note 3), this return was examined and listed by the collector and forwarded to the Commissioner, that thereafter "the Commissioner assessed the tax on the basis of the Collector's list," and that thereupon, the collector spread upon his roll the tax so assessed; and it duly appears that the tax shown by this return and levied in this way was paid during the calendar year 1919. Evidently, when the return was reached for more careful investigation, the Bureau directed an inquiry as to the propriety of this amortization deduction. This was not only by virtue of the Commissioner's general power to redetermine a tax,

but pursuant to the express provision of this paragraph (8) of section 234 (a) of the 1918 act, as well as of the corresponding provision of the 1921 act, which gave the Commissioner specific power for this very inquiry. On October 30, 1921, an engineer, representing the Commissioner and more particularly representing the Amortization Section of the Bureau, made an examination and recommended that the $28,000 deduction, thus taken in the return, be allowed to the extent of $11,000 and disallowed for the remaining $17,000. This report was approved by the Chief of Engineers and by the Chief of the Amortization Section. In December of the same year, some agent of the Bureau made an examination of the taxpayer's books and records and recommended also the disallowance of the $17,000. It does not appear that there was any further action at this time by the higher officers of the Bureau. In October, 1922, the taxpayer requested a redetermination upon the point and an allowance of its whole deduction, as originally taken. Pursuant thereto, another Bureau engineer visited the plants and made an investigation; and, in May, 1923, his report was approved by the Chief of the Amortization Section. This report recommended that out of the total deduction of $28,000, $23,000 be allowed and $5,000 be disallowed; and it was expressly said to supersede the report of October, 1921.

When the petitioner filed its return, it had applied for a special assessment of its profits tax under sections 327 and 328 of the Revenue Act of 1918 (40 Stat. 1093). In November, 1923, in a letter from the Commissioner, acting by an unspecified Chief of Section, petitioner was told that, before this application could be considered, there must be a final determination of the net income, and that petitioner must therefore decide whether it would acquiesce in the determination of net income proposed in this letter, in which determination the amortization allowance was stated as being $23,000. The petitioner replied it would acquiesce in this determination, upon a certain condition, which condition was later accepted by the Commissioner; and the petitioner thereon, in January, 1924, definitely acquiesced in the determination involving this $23,000 allowance. Nothing further was done by the Bureau until in April, 1926, it proposed a deficiency assessment of taxes based upon a computation which seems to have adopted the $5,000 disallowance of the May, 1923, report and the January, 1924, agreement, and an additional disallowance of about $8,000, the basis

---

[1] The Revenue Act of 1921, § 250 (d), 42 Stat. 264, first contains "at any time" in this connection, but the deficiency assessment involved was not made under that act, nor does it seem helpful in the interpretation of the later acts.

of which does not appear, but which was apparently first proposed in this April, 1926 action. Pursuant to this April letter, the deficiency assessment in controversy was made.

The difficulty in construction arises because the Bureau practice did not know, by these words, any such thing as a "tentative allowance" of any deduction claim by the taxpayer as against his gross income. There were numerous deductions expressly provided for, and they were eventually examined and approved or disapproved by various agencies in the Bureau, the result being merged into and evidenced by the deficiency assessment or the credit to the taxpayer later determined; but no statute or regulation had defined or indeed recognized a "tentative allowance" of anything. If the phrase extended, without limitation, to the deduction taken in the return itself, the result is that the limitation bar is wholly removed as to this item, and that these amortization deductions can be revised and deficiency taxes assessed after ten years or twenty years; and the congressional intent to do that is so improbable that it should not be inferred, if it may reasonably be avoided. We have not been referred to any committee report or congressional action indicating the purpose or reason of Congress, either in permitting these deductions to be revised within a definite period (which might extend well beyond the five-year period),[2] or in permitting a change therein to be made at any time if there had been a tentative allowance, as was done by the Revenue Acts of 1924 and 1926. If, however, we find the probable reason of making these exceptions to the limitation, that will lead us, or perhaps direct us, in the interpretation of the language used.

When the Revenue Act of 1918 was drafted and introduced, the future duration of the war was unknown. The proper amortization deduction could not be determined until the end of the war, because the number of years in the term and the utility of the property for other purposes at the end of the war were necessary elements of the computation. For the time being, no intelligent revision could be made of the taxpayer's estimate upon this item. It was therefore appropriate to give the power of revision at any time within three years after the end of the war, or before June 15, 1924; and this

necessarily would create an exception to the four or five year limitation, which might expire before June 15, 1924. When the Revenue Act of 1924 was adopted, which first conditionally permitted this revision "at any time," it was well known that the examination and revision of these tax returns by the Bureau was from three to five years in arrears, and that there were doubtless many returns claiming this amortization deduction which had never been examined. The further extension of time to assess a deficiency was therefore appropriate; but why should it have been made to be without limit, and thus in direct conflict with the general policy of fixing a time of repose? We can conceive only one reason. The return showed only the taxpayer's estimate. Its actual true amount was to be determined by subsequent events, which might be very considerably postponed. At the end of the war, the buildings and equipment might be substantially worthless for any other purpose, so that there would be a minimum salvage. There might be very adaptable peace-time purposes which had been developed, so that there would be no amortization, as distinguished from depreciation (separately allowed). Very probably, as the event proved, adaptability for peace-time purpose would be uncertain, and there would be indefinite delay before events developed a use which would minimize the amortization. As a deduction taken when the return was made and the tax paid might seem to be reasonable, and as thus investigation and revision by the Bureau might never have seemed to be called for, it was reasonable to ask the taxpayer to submit to a deficiency assessment if and when it developed that his returned deduction had been too large. To extend this period without limit might have been thought unwise; but no one could fix the maximum period within which new events, or newly observed events, might make revision appropriate, and so Congress fixed no limit. In this view, we have a possible, if not probable, reason for wholly removing the limitation bar.

This reason does not apply, or applies with minimum force, to those cases where during the normal period of assessment the Bureau has taken up the very question involved and considered and passed upon it, and reached a relatively final conclusion, so that, after the subject had been disposed of in accordance with the practice of the Bureau, there remained opportunity for assessment by the Commissioner within the limitation period. If the language of the Revenue Acts of 1924 and 1926 can be reasonably construed to per-

---

[2] Revenue Act of 1918, § 234 (a) (8), allowed redetermination within three years after the end of the war; the same section of the Revenue Act of 1921, fixed March 3, 1924, as the last day for making or claiming this revision; and the Revenue Act of 1926, § 1209 (26 USCA § 1072), extended the time of claim till June 15, 1924.

mit assessment at any later time in the first class of cases and not in the second class, we can approximate an intelligent interpretation of the statutes in this particular.

We think the original return, and the automatic action taken in connection therewith, may well be considered the "tentative allowance," and the only "tentative allowance," to which the Revenue Acts of 1924 and 1926 relate. In a very fair sense it was an "allowance," and in a very fair sense it was "tentative." The statutory reference is not restricted to an allowance made by the Commissioner. When the taxpayer makes his return, he proposes this deduction, and he "makes" it in computing and paying his tax. When the collector and the Commissioner accept the report, the Commissioner assesses the tax [3] involving and based upon this deduction, and the collector spreads the tax on his rolls and collects it, the taxing authorities very plainly "allow" this deduction. The Commissioner might immediately have rejected it and insisted upon a revision; when he did not, but made the assessment and directed the spreading of the tax based thereon, there was acquiescence, which was in necessary effect, for the time being, an approval and allowance.

Very clearly this allowance, like the contemporary acquiescence in other elements of the return, was "tentative"; it had no element or color of finality. It involved acquiescence only, not action. It answered every definition of "tentative," because it was only on trial until it should be challenged. When we put these considerations with the fact that the statutory language must have been intended for the ordinary typical case and not for some unusual one, the fact that in the ordinary case, which had never gone beyond the making of the return, there was

reason for preserving the right of revision, and the fact that no such thing as a "tentative allowance," by that name, was known in the Bureau practice, we see no reason for doubting that the statutory reference was to that original allowance proposed by the taxpayer and accepted without objection or criticism by the Bureau, unless there is some reason in the objection that this construction necessarily removes all limitation as to all cases where this deduction was ever claimed and thus tentatively allowed, and that such construction is unnatural.

When such a claimed deduction is taken up by the Bureau, challenged, investigated, and passed upon by the highest appropriate authority in the Bureau (save the, usually formal, action of the Commissioner), as here by the Chief of the Amortization Section, and when the tentative allowance has been reexamined and superseded by other action affirming or disaffirming the first, the original "tentative allowance" to which the statute refers has disappeared; it has been merged in a relatively final allowance. True, this second allowance is, in a strict sense, also tentative, because the Commissioner, or even the under officers, continue to have power to set it aside, until there is a written stipulation or until the limitation period expires; but the fact that the statutory language literally applies both to the original wholly tentative allowance, and to the later relatively final action, does not prevent a conclusion that it was intended to apply to the first and not to the second. There is a fairly good reason for the law as applied to the first. We can conceive of no reason which might possibly have moved Congress for application to the second; and we conclude that it does not so apply.

In the present case, this result is emphasized by, although it does not necessarily depend upon, the way in which the November, 1921, allowance was treated. The taxpayer was required to accept it and consent to it as a final allowance for the purpose of fixing his income tax on this basis, and as a condition of further considering his other request; which then the Bureau, when the finality of the allowance was thus agreed to, proceeded to consider. This indicates at least the different character of the original automatic and tentative allowance and of that special later allowance which was apparently the end of the controversy, and which only required the formality of the Commissioner's approval to be as final as any allowance could be.

[3] T. R. 45, art. 1012. *Assessment of Tax.* When the returns are received at the collector's offices they are examined and listed before being forwarded to the Commissioner. If it appears that the tax is greater or less than shown in the return it is recomputed. After checking the figures the Commissioner assesses the tax on the basis of the collectors' lists. The collectors then send out bills for the taxes, either as computed by the taxpayer or as recomputed. If a taxpayer believes that he has been over assessed, he may file a claim for abatement or (after payment of the tax) for a refund of the excess. Section 252 of the statute and articles 1031-1038. As soon as practicable the returns are carefully audited by accountants in the office of the Commissioner at Washington, assisted where necessary by reports of the examination of taxpayers' books and records made by revenue agents in the field. If error in a return is detected, the taxpayer is notified accordingly and an additional assessment is made against him or he is given the opportunity to file a claim for a refund, as the case may be.

For these reasons, we conclude that the deficiency tax assessed was not attributable to a change in the deductions which had been tentatively allowed in connection with the filing of the report, but was attributable to a change in the deductions which had been allowed by the Bureau's action of November, 1923, and of January, 1924, and which was not that kind of "tentative allowance" which Congress intended to have the effect of removing entirely the statutory bar.

The action of the Board is therefore affirmed.