**DIAMOND ALKALI CO. v. HEINER, Collector of Internal Revenue.**

No. 5762.

District Court, W. D. Pennsylvania.

Feb. 10, 1930.

See also 39 F.(2d) 643.

John W. Davis and Montgomery B. Angell, both of New York City, Marion N. Fisher, of Washington, D. C., and Smith, Shaw, McClay & Seifert, W. A. Seifert, and Maynard Teall, all of Pittsburgh, Pa., for plaintiff.

Louis E. Graham, U. S. Atty., of Beaver, Pa., John A. McCann, Sp. Atty., Bureau of Internal Revenue, of Pittsburgh, Pa., and Elden O. Hanson, Sp. Atty., Bureau of Internal Revenue, and Clarence M. Charest, Gen. Counsel, Bureau of Internal Revenue, both of Washington, D. C., for defendant.

GIBSON, District Judge.

This suit has been brought by the plaintiff against the defendant to recover alleged overpayments of 1918 and 1920 income taxes which were made over protest and pursuant to threats of distraint. A jury trial was waived by both parties.

The claim of the plaintiff asserts improper assessment and collection from it of taxes for the years 1918 and 1920. First, it is alleged that the Commissioner of Internal Revenue assessed against the plaintiff, and the defendant wrongfully collected from it, a sum which should have been credited to

648

plaintiff as a reasonable deduction from the latter's 1918 taxes for the amortization "of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war." Section 234(a)(8) of the Revenue Act of 1918 (40 Stat. 1078). The second phase of the claim alleges an unlawful assessment and collection of an amount which properly should have been allowed plaintiff as a credit for depreciation upon its 1918 taxes. A third branch of the claim sets out a wrongful determination of plaintiff's excess-profits tax rate under special assessment (sections 327 and 328, Revenue Act of 1918) at 54.54 per cent. instead of 45 per cent., as claimed by the plaintiff, and a following illegal collection by the defendant. A fourth phase of the claim asserts that the Commissioner wrongfully assessed against plaintiff the sum of $574,372.-90 as additional income and profits taxes for the year 1917, and, in the computation of plaintiff's taxes for 1920, improperly deducted such sum from the plaintiff's invested capital, thus making it appear that plaintiff's invested capital for 1920 was less in proportion to its income than was actually the case; and this wrongful deduction in the assessment was followed by the defendant's illegal collection of the increase in tax thus improperly created.

We shall discuss each of these four contentions of plaintiff at greater length, but before doing so will notice another claim which relates to the entire amounts of 1918 and 1920 taxes for which suit has been brought. Such amounts were assessed on November 1, 1927, and paid under protest on November 15, 1927, after rejection of refund claims. The plaintiff's returns for 1918 and 1920 were filed on June 16, 1919, and May 31, 1921, respectively, considerably more than five years before the assessment and collection of the amounts in question, and plaintiff has based upon this fact its contention that the collection was illegal because the statutory period therefor had expired.

Section 250(d) of the Revenue Act of 1921 (42 Stat. 265) required a determination and assessment of the 1918 and 1920 taxes within five years after the return; and section 1106(a) of the Revenue Act of 1926 (26 USCA § 1249 note) provided that "the bar of the statute of limitations against the United States in respect of any internal-revenue tax shall not only operate to bar the remedy but shall extinguish the liability."

However, section 250(d) of the Act of 1921 and subsequent Revenue Acts have provided that the limitation shall not apply where the Commissioner and the taxpayer have agreed in writing to a later determination, assessment, and collection of the tax, and defendant justifies the collections in the instant action under this provision. As appears from the findings of fact, while plaintiff's petition for refund was pending, and prior to the expiration of the collection period, the Commissioner demanded the execution of a waiver by the plaintiff, which executed and returned the agreement required and in due time received an acknowledgment of its receipt by the Commissioner and information from him to the effect that it was in force and on file in his office. Prior to the expiration of the waiver period, other like agreements extending the limitation period were executed by plaintiff and filed with the Commissioner. The plaintiff denies the sufficiency of these waivers as a bar to the statute on the ground that they were not personally signed by the Commissioner, nor even by one specifically authorized to do so. The testimony does not disclose the actual signer of the waivers, but does make it plain that they were not signed by the Commissioner in person. However, it would seem that the circumstances require the application of the presumption in favor of the regularity and validity of the acts of a public official. Personal signature of all such waivers on the part of the Commissioner would be practically impossible and, we think, is unnecessary; and due authorization of another to sign for him is to be inferred from the Commissioner's demands for the waivers, his acknowledgment of their receipt, the filing of them in his office, and his reliance upon them in passing upon plaintiff's application for refunds. The waivers offered in evidence by the defendant were sufficient, in our opinion, to toll the statute of limitations.

#### Amortization Claim.

In this phase of plaintiff's claim, also, a question of limitation arises. One Griffith, an engineer in the Amortization Section of the Bureau of Internal Revenue, pursuant to a prior investigation, on October 23, 1921, filed a report wherein he recommended an allowance to plaintiff of $1,344,465.15 on account of amortization of its war facilities, of which amount $1,245,448.21 was to be deducted from 1918 gross income, and $99,016.94 from 1919 gross income. On December 1, 1921, this report was approved by the Chief

of Engineers of the Amortization Section and also by the Acting Chief of the Section. On December 2, 1921, at plaintiff's request, a copy of Griffith's report was mailed to plaintiff. In the letter of transmittal plaintiff was informed that such report was not final, and that no protest or request for modification would be considered until such time as the taxpayer should be notified of the result of the complete audit and examination. Subsequent to the transmittal of the letter of notification, a thirty-day period, taxpayer was informed, would be allowed for the presentation of objections to the allowance. Nothing was done in connection with plaintiff's amortization allowance prior to October 1, 1924, when one Luce, an engineer in the Appraisal Section (formerly the Amortization Section), was assigned to re-examine the matter. On April 1, 1925, Mr. Luce examined plaintiff's plant, and on November 4, 1925, filed a report wherein he recommended an amortization allowance to plaintiff of $468,812.30, of which amount $446,283.67 was to be deducted from 1918 income, and $22,528.63 from 1919 income. On November 17, 1925, Mr. Luce filed a second report wherein he recommended an allowance for amortization of $387,224.40, of which amount $369,022.30 was to be deducted from 1918 income, and $18,202.10 from 1919 income. The first report was entitled "Report on Redetermination of Amortization Claim," and the second, "Office Report on Second Redetermination." The second report was approved by the Commissioner, who sent plaintiff the thirty-day letter, mentioned supra, wherein plaintiff was notified of the allowance approved.

■ The plaintiff contends that the Griffith recommendation, when approved by the Chief of Engineers and the Chief of the Amortization Section on December 1, 1921, was a determination of plaintiff's amortization deduction, and that the Commissioner was prohibited from re-examining it at any time subsequent to March 3, 1924, by sections 234(a) (8) of the Revenue Acts of 1918 and 1921. That section of the Act of 1921 after providing for a "reasonable deduction" for amortization of war-time facilities, further provided: "At any time before March 3, 1924, the Commissioner may, and at the request of the taxpayer shall, re-examine the return, and if he then finds as a result of an appraisal or from other evidence that the deduction originally allowed was incorrect, the income, war-profits, and excess-profits taxes for the * * * years affected shall be redetermined. * * * "

Just exactly what Congress had in mind, when the above-quoted part of section 234(a) (8) was enacted, we do not undertake to surmise; but it plainly did not intend to prevent any examination of an amortization claim after March 3, 1924, on the part of the Commissioner. To hold otherwise would be to ignore the proviso of section 250(d) of the Revenue Act of 1921, which asserts: "Provided further, That in cases coming within the scope of * * * or of paragraph (8) of subdivision (a) of section 234 * * * the amount of tax or deficiency in tax due may be determined, assessed, and collected at any time; but prior to the assessment thereof the taxpayer shall be notified and given a period of not less than thirty days in which to file an appeal and be heard as hereinafter provided in this subdivision."

■ We are unable to accede to plaintiff's assertion that the approval of the Griffith report by the Chief of Engineers and the Chief of the Amortization Section was a determination of plaintiff's amortization allowance. It is undoubtedly true that employees in the Amortization Section regarded and spoke of such approved reports as "determinations," despite the fact that they were still subject to audit, but the fact remains that the power of determination had not yet passed from the Commissioner, and did not pass from him prior to his issue of the thirty-day letter when the taxpayer was notified of his decision and given opportunity to appeal.

■ Plaintiff's amortization claim is not finally concluded by the failure of its contention in respect to the limitation of the Commissioner's power to pass upon amortization deductions. It may, by the fair weight of the evidence, show that the Commissioner's decision in respect to the proper amount of its amortization deduction was clearly wrong, and that it was compelled by the collector, the defendant, pursuant to that erroneous decision, to pay an amount not properly due the United States as a part of the amount of its 1918 taxes. If plaintiff so shows that it was entitled to an amortization allowance in excess of the amount determined by the Commissioner, it is entitled in the instant action to a judgment for at least the amount of the excess.

The Commissioner's determination of the amount of the amortization allowance was based entirely upon the recommendations of the second Luce report. Mr. Luce, in arriving at his conclusions, considered individ-

ual facilities, or facilities grouped by departments. He found that the plant originally had manufactured only soda ash; that a department had then been installed for the manufacture of caustic soda, and later departments had been added for the production of refined bicarbonate of soda. Soda ash is the base of caustic soda, bicarbonate of soda, and washing soda. Mr. Luce also found that the plaintiff, during the war period beginning April 6, 1917, had also constructed various general plant facilities, such as a machine shop, a locomotive shed, cooper shop, boilers, beidge crane, etc. After the war period the plaintiff added to its number of boilers, increased its caustic soda department, added a washing soda department, constructed an office building and a new boiler shop, a by-product coke plant, and a cement plant. Plaintiff's records show that neither the caustic soda nor the refined bicarbonate departments had, during the postwar period, decreased its production of the war period, but on the contrary each was steadily increasing in output. Luce therefore found that the post-war residual value of the war-time additions and establishment of these departments of the plant was equal to their war-time value, and therefore recommended no amortization allowance for them. The report alleged that the cooper shop was of minimum size for a plant such as that of the plaintiff, and denied amortization allowance thereon. In like manner he found full residual value in the machine shop and oil storage building, for each of which amortization was claimed. The same finding and recommendation was made in relation to certain miscellaneous equipment. The report also recommended disallowance of amortization deduction for a limestone dock and equipment, purchased at a cost of $340,000 during the war period. Certain special apparatus, including a flaking machine, six tank cars, an Oliver filter, and an ash pit, were granted the amortization deduction claimed by plaintiff. It was also recommended in the report that an allowance of 15 per cent. be made for amortization upon the boiler house equipment; the amount awarded being $29,489.92 for 1918. Amortization was denied for real estate purchased for $205,969.10. The cost of the facilities for which amortization allowance was claimed for the years 1918 and 1919, less 1917 depreciation, was $3,099,988.83, and an allowance of $1,756,453.64 was claimed. From the total cost the approved report deducted the various costs which have been partially enumerated above, and which total $1,103,319.98 for the year 1918, and $141,572.43 for 1919. The total of costs for 1918, on which amortization is claimed, is $2,880,075.38. Excluding the boiler house equipment and tank cars, and other special equipment, mentioned above, of which the cost in 1918 was $39,889.46, also for which an amortization allowance of $18,833.76 was recommended, the report recommended an allowance of 21 per cent. upon the costs for 1917–18 which had not been disallowed, less 1917 depreciation. The total allowance in amount was $369,022.30. In arriving at 21 per cent. of the war-time costs of the plaintiff as the proper amount for amortization allowance, Luce, in accordance with the general practice in the Bureau of Internal Revenue, multiplied the allowed costs of the facilities installed during the war period by a fraction, of which the numerator was the amount of plaintiff's average monthly production during 1923, the year of highest production, the post-war period (March 3, 1921 to March 3, 1924), and the denominator was the average monthly capacity of the plant at the end of the war. As representative of, and indicating the capacity and production of the plant, soda ash, the basic product of the plant, was chosen as best representing the production and capacity of the plant. Mr. Luce, from the records of the plaintiff company, found that it had produced a monthly average of 26,163 tons of soda ash during the year 1923, and that the plant had a monthly capacity of 33,250 tons of the same product at the end of 1919. The fraction formed by monthly production over monthly capacity was approximately 79 per cent., which was taken as the value in use of the facilities represented by the allowed costs, and the full cost value less the value in use, or 21 per cent., was the portion of such allowed costs which represented the proper amortization allowance of plaintiff.

The plaintiff asserts that Luce's calculation of its amortization allowance, adopted by the Commissioner, was incorrect. While insisting that the Griffith report, approved as it was by his immediate superiors, and not having been overturned prior to March 3, 1924, was a final determination of its amortization deduction, it contends that if the matter were now open for consideration, an allowance of $1,245,448.21 would be correct. First, plaintiff attacks Mr. Luce's treatment of its plant as composed of several distinct departments, and his consequent exclusion from consideration for amortiza-

tion allowance of costs incurred in the installation of facilities in certain of those departments which were alleged to have operated as fully during the post-war period as during the war. Its plant, says plaintiff, was one harmonious unit, and the extent of the use of the various facilities comprising the plant could not be determined separately or by departments, but only as a unit. It further says that the capacity and production of the plant can be accurately stated only in terms of soda ash, the basic alkali product manufactured. Plaintiff concedes the propriety of arriving at an amortization allowance by a comparison of the post-war period production with the capacity of the plant at the end of the war, as was the practice in the Bureau of Internal Revenue, but insists that the Luce report not only unduly decreased the proper allowance by a disallowance of costs incurred in several departments, as hereinbefore set forth, but also erroneously increased the average monthly production of soda ash and decreased the actual capacity of the plant, thus making it appear that the value in use of those facilities, for which costs had been allowed, was much greater than was actually the case. To put plaintiff's position in more concrete form, it is urged that plaintiff, upon its 1918 taxes, was entitled to an amortization allowance based upon an expenditure of $2,880,075.38 for war facilities during the years 1917 and 1918, such sum being the total amount then expended throughout the entire plant, without regard to the fact that part of it had purchased equipment for departments of the plant which manufactured more caustic soda and refined bicarbonate of soda in the post-war period than during the war period. In addition to its claim of error based on disallowance of costs on the caustic soda and refined bicarbonate departments, plaintiff contends that the amount of soda ash manufactured during the post-war period was not an average of 26,163 tons per month, but was 22,597 tons per month, and that the capacity of the plant to produce soda ash was not 33,250 tons per month, but was 45,017 tons per month.

Considering the issue in respect to the disallowance of costs for facilities in the caustic soda and bicarbonate sections of the plant, we find no error in Mr. Luce's method in classifying the expenditures for such war facilities, and in excluding from the amortization equation such sums as went to purchase equipment which was in greater use in the post-war period than it had been in the war

period. The statute prescribes no method for the determination of the proper amortization allowance. A general rule, such as adopted by the Commissioner, is doubtless necessary as a matter of practice; but the Commissioner might, if he saw fit, subject each separate facility to appraisal and specific determination of residual value, rather than apply a general formula to part or all of the equipment of the plant under consideration for amortization. In our opinion, the action of the Commissioner in approving the exclusion from the equation of the caustic soda and bicarbonate expenditures was justified by the testimony; which, with the exception later mentioned, also justifies the exclusion of the costs of the machine shop building, the cooper shop, the oil storage building, and certain miscellaneous equipment, mentioned in Luce's schedule of costs upon which amortization was disallowed. All of such buildings and equipment were found to be no more than adequate for a plant having a production equal to that of the plaintiff during the post-war period.

The Commissioner, by his approval of the Luce report, has excluded from the costs for which amortization was allowed an expense of $340,000 incurred in the purchase of a limestone dock and equipment. The exclusion was upon the ground that the dock was a necessity to the plant as a whole, and was only sufficient in size for the plaintiff's requirements. The testimony does not justify this exclusion, but fairly shows that the dock was approximately one-third larger than was required by plaintiff in the post-war period. We have therefore added this cost to those for which amortization has been allowed.

The Commissioner, through Luce, to determine the residual value of plaintiff's 1917-18 facilities, used plaintiff's average monthly production of soda ash for 1923 as a numerator, and its monthly average per furnace for the last ten months of 1918, multiplied by the number of furnaces under construction or completed, as a denominator, and multiplied the fraction so obtained, $\frac{26163}{33250}$ (which equals 79 per cent.) by the allowed costs of the war-time facilities installed in 1917 and 1918. Plaintiff points to the fact that its production for 1923 was in excess of that of any other year of the post-war period, and contends that it was entitled to have its production for that period determined in accordance with the ordinary usage

of the Internal Revenue Bureau, by which the monthly average of the entire post-war period would be taken. It likewise attacks the finding of the examiner in respect to the capacity of its plant at the end of the war. It denies that the last ten months of 1918 fairly disclose the capacity, and points out the bad labor conditions of the period which, it asserts, prevented its furnaces from attaining full capacity. It attempts to fix that capacity by citing its production in June, 1924 (after the post-war period), when its furnaces averaged 40 tons of soda ash per day. It asserts that an average of 37 of its 41 furnaces can be kept in operation all the time, and that 40 tons fairly represents the daily soda ash capacity of the plant.

 The contention of the plaintiff in respect to the war-period production is justified, we think. In the interest of uniformity of practice and correct conclusion, the monthly average output during the entire post-war period should be taken, rather than the average of the year of highest production. As to the capacity of the plant at the end of the war, we have not been satisfied that the examiner was in error. The capacity claimed was attained only for a single month, and that after the close of the post-war period. The plant never exceeded the production of the last ten months of 1918 for any extended period. True, labor conditions were bad in those months and tended to reduce production; but, on the other hand, plaintiff was then straining to produce all the soda ash possible, and this effort undoubtedly offset the labor deficiencies to a large extent.

The testimony fairly establishes the post-war production of plaintiff as 22,597 tons of soda ash per month, and the capacity of the plant as 33,250 tons per month. Applying the Commissioner's equation, the residual value of the plant was 68 per cent., and the plaintiff was entitled to an amortization allowance of 32 per cent. of the proper costs of its war-time facilities. The 1917 and 1918 costs for which amortization should properly be allowed amount to $2,108,361.40, after deduction of the 1917 depreciation. From this amount is to be deducted the costs of the boiler house equipment, for which specific amortization allowance was fixed. The 1918 boiler-house equipment costs, less depreciation for 1917, amounted to $196,599.45, and the cost of the flaking machine, six tank cars, an Oliver filter, and one ash pit, less depreciation, amounted to $39,889.46. Deducting these amounts from $2,108,361.40, we have

$1,871,872.49 as the sum of the costs upon which plaintiff, in addition to the Commissioner's specific amortization allowance, is entitled to receive an allowance of 32 per cent., or $598,999.68, which, with the total of the special allowances, amounts to $646,996.01, the total amount of the amortization allowance to which plaintiff was entitled upon its 1918 return.

 It is correct procedure to "spread" the deduction for amortization over the entire period the amortized facilities were in use as war-time facilities, and not credited only to the year in which the costs were incurred. The war-time period use, for the present purpose, was from January 1, 1918, to March 31, 1919. The income of plaintiff for 1918 was 85.62 per cent. of its total income for that period, and therefore that percentage of the amortization of 1918 costs has been allocated to 1918 income, and 14.38 per cent. of such costs to 1919 income. By this allocation the sum of $553,957.98 is deductible from 1918 gross income, and $93,038.03 from 1919 income. The Commissioner having allowed an amortization deduction (allocated in the same proportions herein adopted) from 1918 income of $315,956.89, in arriving at plaintiff's correct tax for that year, a further deduction of $238,001.09 from the income of that year must be made. Such a deduction has been made in the schedule, attached hereto, showing a computation of plaintiff's 1918 tax.

### EXHIBIT I
#### SCHEDULE
#### 1918 Taxes

| | | |
|---|---:|---:|
| Net income | | $3,821,143 63 |
| Deduct additional amortization | | 238,001 09 |
| | | $3,583,142 54 |
| Excess Profits Tax at 54.54% | | $1,954,245 94 |
| Income Tax: | | |
| Net income | | $3,583,142 54 |
| Less: | | |
| Profit Tax | $1,954,245 94 | |
| Liberty Bond Interest | 17,819 46 | |
| Exemption | 2,000 00 | 1,974,065 40 |
| Balance taxable at 12% | | $1,609,077 14 |
| Excess Profits Tax | | $1,954,245 94 |
| Balance at 12% Tax | | 193,089 26 |
| Total Income and Profits Tax | | $2,147,335 20 |
| Tax Payments: | | |
| With return | | $1,074,749 11 |
| November 15, 1927 | | 1,215,615 14 |
| Total payments | | $2,290,364 25 |
| Total due | | 2,147,335 20 |
| Overpayment Tax | | $ 143,029 05 |
| Interest overpaid | | $ 13,852 37 |
| (Interest at .09685 on $143,029.05) | | |
| 1918 Tax overpaid | | $ 143,029 05 |
| Interest overpaid | | 13,852 37 |
| Total overpayment | | $ 156,881 42 |

Calculation of Tax Based on Court's Decision for
1916, 1918, 1919, and 1920.

**1920**

| | | |
|---|---|---|
| Invested Capital Commissioner's letter—Exhibit 5 ........................... | | $7,346,041 07 |
| Add: | | |
| (a) Additional tax assessed by Commissioner for 1917—admitted to have been deducted from Invested Capital in error............... | | 304,920 97 |
| (b) Additional tax assessed by Commissioner for 1917 in addition to (a) above, decided by the Court to be refundable.................. | | 269,451 93 |
| (c) Refund of tax allowed by Court for 1916 .............................. | | 6,325 77 |
| (d) Refund of tax allowed by Court for 1918 .............................. | | 143,029 05 |
| (e) Proration of refund of tax allowed by Court for 1919—13,106.40 x .4214 | | 5,523 04 |
| | | $8,075,291 83 |
| Deduct: | | |
| Additional amortization allowed for 1918............. | $238,001 09 | |
| Additional amortization allowed for 1919............. | 49,525 73 | |
| Total deduction......................... | | 287,526 82 |
| Corrected Invested Capital............... | | $7,787,765 01 |
| Net Income .............................. | | 1,529,710 37 |
| Excess Profits Tax Credit ($7,787,765.01 × .08 + $3,000) ............ | | 624,021 20 |
| Excess Profits Tax: | | |
| Net income ................ | $1,529,710 37 | |
| Less credit ............... | 624,021 20 | |
| Taxable at 20%........... | 905,689 17 | $ 181,137 83 |
| Income Tax:' | | |
| Net income ............... | $1,529,710 37 | |
| Less: | | |
| Excess Profits tax..... | $181,137 83 | |
| Liberty Bond Int. ........ | 80,253 71 | |
| Exemption .. | 2,000 00 | 263,391 54 |
| Taxable at 10%............. | $1,266,318 83 | 126,631 88 |
| Total Tax ................................. | | $ 307,769 71 |
| Tax Payments: | | |
| With return................ | $263,891 89 | |
| November 15, 1927.......... | 60,769 03 | |
| | | $ 324,660 92 |
| Total Tax ................................ | | 307,769 71 |
| Overpayment Taxes ..................... | | $ 16,891 21 |
| Interest overpaid ........................ | | 1,637 97 |
| | | $ 18,529 18 |

Interest paid Nov. 15, 1927, or
.096972 of $60,769.03............ $5,892 93
Interest at .096972 on $16,891.21.. 1,637 97

### Depreciation.

 The Commissioner allowed plaintiff a depreciation of $437,262.55 for 1918. This was based upon a 10.4 per cent, allowance, which in turn was founded upon an estimate that the average life of the facilities in plaintiff's plant was 9.6 years. The plaintiff does not attack 9.6 years as an unreasonable composite estimate of the probable useful existence of its plant for the years for which it was granted (1917–1920, each inclusive), but asserts that its machinery, largely by reason of its necessity to use inexperienced and inefficient laborers, wore out twice or three times as rapidly in 1918 as in other years. We are entirely satisfied that the labor situation did reduce the useful life of plaintiff's machinery more rapidly in 1918 than in other years, but that conclusion does not enable us to say that the Commissioner's allowance for exhaustion, wear and tear, and obsolescence for that year was inadequate; nor does it furnish any reason for an increase of the allowed amount which is based upon any proper theory. The plaintiff's contention, reduced to its essentials, is that the wear and tear upon its machinery was more than twice as great in 1918 as in 1917 or 1920, and that the Commissioner, having allowed a composite rate of 10.4 per cent. for 1917 and 1920, should have fixed for 1918 a rate more than twice as large upon all of plaintiff's property upon which no amortization had been allowed. But tangible proof to establish the contention is lacking. Officers of the company have testified to the labor conditions and have expressed their estimate of its effect upon their plant; and they have also stated that much of their machinery was obsolescent. But there has been little, if any, testimony to specify the machinery replaced on account of wear and tear or obsolescence, or the cost of such machinery so replaced. On the other hand, there is evidence to the effect that much of the machinery subject to the hard usage of 1918 was still in use at the time of trial, and that the same was true in respect to the machinery alleged to be obsolescent in 1918. It also appeared that plaintiff had taken large credits against gross income for repairs upon machinery, and specific credits for particular machines abandoned. Such credits have the direct effect of reducing the allowance which plaintiff may rightfully demand for depreciation.

 The plaintiff has the burden of proving that the Commissioner's allowance was inadequate, and having failed to group its facilities, which vary in respect to length of existence, and to show the machinery replaced in use subsequent to 1918, and when replaced, or the amount expended for repair of such machinery which was charged against capital rather than gross income, we feel that it has failed to furnish such proof as would justify the court in finding that the Commissioner was in error in his allowance.

### Deduction from Invested Capital for 1920.

The Commissioner, in determining plaintiff's 1920 taxes, deducted from its invested capital $574,372.90. This amount was its

alleged liability upon an additional assessment, since collected by defendant, for the year 1917. The Commissioner has admitted that the reduction was incorrect as to $304,920.97, and has remitted the tax to that extent, but asserts, as does defendant, that $269,451.93 was properly deducted.

The present action was tried at the same time as the case between the same parties at No. 5613. 39 F.(2d) 643. In that case the plaintiff seeks to recover $269,451.93, taxes for the year 1917 paid under protest, with $50,023.75, interest paid thereon, or a total of $319,475.68, with interest from the date of payment; also $6,325.77, with $1,166.66 interest, 1916 tax overpaid under the same circumstances. Upon consideration of the testimony in that case, we have determined that plaintiff is entitled to recover, as the payments were enforced after the expiration of the statutory period had both barred the remedy and extinguished the liability. This conclusion carries with it a finding that the deduction from invested capital for the year 1920 was incorrect, both as to the sum of $304,920.97, concerning which error has been confessed, and $269,451.93, which defendant maintains was properly deducted. The latter sum should therefore have been added to plaintiff's invested capital for 1920 in determining its tax for that year.

In addition to the case at No. 5613, another at No. 5761[1] was tried at the same time as the instant case. This case at No. 5761 was based upon an alleged overpayment of 1919 taxes. We have found that plaintiff was entitled to a greater amortization deduction for 1919 costs than was given, and also that it should have had an additional amount to the sum allocated to it by the Commissioner as an amortization allowance upon 1918 costs. The proper computation of plaintiff's tax for 1920 requires the addition to invested capital, as found by the Commissioner, of $304,920.97, and $269,451.93, deducted in error by reason of illegal collection of 1916 and 1917 taxes, as aforesaid; also the addition of the refund of $143,029.05 on account of 1918 taxes, discussed supra in this opinion, and the Commissioner's regulation proration of the refund of tax found to be overpaid for the year 1919 in the action at No. 5761. A computation of plaintiff's 1920 taxes is a part of the schedule attached to this opinion wherein the 1918 taxes are also computed. By it is shown an

overpayment by plaintiff of $16,891.21 in settlement of its 1920 tax liability, and $1,637.97 interest thereon, or a total of $18,529.18. This sum is to be added to the sum of $156,881.42, tax and interest overpaid by plaintiff upon its 1918 taxes, as hereinbefore set forth.

### Excess-Profits Tax Rate.

The plaintiff, in addition to the amortization and depreciation claims in respect to the 1918 taxes, has sought a review of the Commissioner's determination of its excess profits tax rate for 1918. We feel that this court does not have jurisdiction to review the Commissioner's ruling in this respect. See Williamsport Wire Rope Co. v. United States, 275 U. S. 520, 48 S. Ct. 140, 72 L. Ed. 404.

---

[1] Decided on memorandum of statement of facts and conclusions of law. No opinion filed.