DIAMOND ALKALI CO. v. HEINER, Collector of Internal Revenue.

HEINER, Collector of Internal Revenue, v. DIAMOND ALKALI CO.

LEWELLYN v. SAME.

Nos. 4419, 4426, 4427.

Circuit Court of Appeals, Third Circuit.

Feb. 10, 1932.

On Rehearing July 26, 1932.

THOMPSON, Circuit Judge, dissenting on Rehearing.

Smith, Shaw, McClay & Seifert, of Pittsburgh, Pa. (John W. Davis, of New York City, William A. Seifert, Maynard Teall, and W. W. Booth, all of Pittsburgh, Pa., and Marion N. Fisher, of Washington, D. C., of counsel), for Diamond Alkali Co.

Louis Edward Graham, U. S. Atty., and John A. McCann, Sp. Asst. U. S. Atty., both of Pittsburgh, Pa. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., of counsel), for Heiner.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

THOMPSON, Circuit Judge.

These cases were tried by the court below under a stipulation of the parties, without a jury. Diamond Alkali Company, the taxpayer, plaintiff below, was engaged in the manufacture of soda ash and related products. It filed its income and profits tax returns for the years 1918 and 1920 on June 16, 1919, and May 13, 1921, respectively, and paid the amounts shown therein as due. Thereafter the Commissioner of Internal Revenue assessed as additional taxes and interest the sum of $1,398,548.54, and collected the same on November 15, 1927, more than five years after the returns.

The plaintiff's claim for refund was rejected by the Commissioner, and suit was thereupon instituted in the District Court for the Western District of Pennsylvania as of No. 5762. Judgment was entered for the plaintiff in the sum of $175,410.60, 39 F.(2d)

645. The case is before this court on cross-appeals Nos. 4419 and 4426.

Suit was also brought by the Diamond Alkali Company as of No. 5761 for the recovery of alleged overpayment of taxes for the year 1919. Judgment was entered for the plaintiff in that suit for $13,106.40.[1] Appeal No. 4427 is taken by the Collector of Internal Revenue alone from that judgment.

Appeals Nos. 4419 and 4426.

The plaintiff's claims for refunds for the years 1918 and 1920 were based on the following general contentions: That the Commissioner of Internal Revenue unlawfully assessed additional taxes for the years 1918 and 1920 after the statute of limitations had run; that the 1918 allowance for amortization of war-time facilities was inadequate; that the allowance for depreciation for 1918 and 1920 was inadequate; that the invested capital for 1920 was wrongfully reduced by the unlawful collection of additional taxes for 1917; that the Commissioner assessed excess profits taxes for 1918 at a rate higher than that lawfully applicable.

The District Court held that the additional assessment for 1918 and 1920 was not barred by the statute; that the amount allowed for amortization by the Commissioner was inadequate in several respects; that the amount allowed for depreciation was lawfully ascertained; that the plaintiff was entitled to have its 1920 invested capital increased by sums collected as additional taxes and interest for 1917; and that the court had no power to revise the rate fixed by the Commissioner under the special assessment provisions. In addition, it directed that the amount allowed for amortization be allocated to the years 1918 and 1919.

Statute of Limitations.

■■ The plaintiff contended that it was entitled to a refund of all additional taxes assessed and collected after the statute of limitations had run, and based its contention upon section 250(d) of the Revenue Act of 1921 (42 Stat. 264), which reads as follows: "The amount of income, excess-profits, or war-profits taxes due under any return made under this Act for the taxable year 1921 or succeeding taxable years shall be determined and assessed by the Commissioner within four years after the return was filed, and the amount of any such taxes due under any return made under this Act for prior taxable years or under prior income, excess-profits,

---

[1] No opinion filed in court below.

or war-profits tax Acts, or under section 38 of the Act entitled 'An Act to provide revenue, equalize duties, and encourage the industries of the United States, and for other purposes,' approved August 5, 1909, shall be determined and assessed within five years after the return was filed, unless both the Commissioner and the taxpayer consent in writing to a later determination, assessment, and collection of the tax; and no suit or proceeding for the collection of any such taxes due under this Act or under prior income, excess-profits, or war-profits tax Acts, or of any taxes due under section 38 of such Act of August 5, 1909, shall be begun, after the expiration of five years after the date when such return was filed, but this shall not affect suits or proceedings begun at the time of the passage of this Act. * * *"

Prior to the expiration of the five-year period, the Commissioner transmitted to the plaintiff an unexecuted agreement, by the terms of which the time for the assessment and collection of the 1918 taxes was extended beyond the statutory period. The agreement was signed by the plaintiff and returned to the Commissioner, who acknowledged its receipt and stated that it was on file in his office. From time to time similar written agreements were transmitted by the Commissioner to the plaintiff, signed by the plaintiff, and returned to the Commissioner, extending the time for assessment and collection to December 31, 1927. Although no one of the agreements was signed by the Commissioner of Internal Revenue in person, all of them were signed in his name, were on file in his office, and were relied upon by him in acting upon the plaintiff's protests. The letters to the plaintiff with reference to the extension agreements went out in the regular course of business and were signed in the name of the assistant to the Commissioner.

The cited statute requires only that the Commissioner and the taxpayer consent in writing to the later determination, assessment, and collection. It does not require that the consent, in order to be valid, be in one instrument or in any particular form. In the instant case, the consent by the Commissioner is found in the letters which were sent out from his office. Contentions against the validity of agreements of extension, because of the lack of the Commissioner's signature, were unsuccessfully made in this court in Liberty Baking Co. v. Heiner, 37 F.(2d) 703. See, also, Trustees for Ohio & Big Sandy Coal Co. v. Commissioner, 43 F.(2d) 782 (C. C. A. 4); Sabin v. United States, 44 F.(2d) 70 (Ct. Cl.); Stern Bros. & Co. v. Burnet, 51 F.(2d) 1042 (C. C. A. 8). In Stange v. United States, 282 U. S. 270, 276, 51 S. Ct. 145, 147, 75 L. Ed. 335, the court said: "As pointed out in Florsheim Bros., etc., v. United States, 280 U. S. 453, 466, 50 S. Ct. 215, 74 L. Ed. 542, a waiver is not a contract, and the provision requiring the Commissioner's signature was inserted for purely administrative purposes and not to convert into a contract what is essentially a voluntary, unilateral waiver of a defense by the taxpayer."

We find no error in the conclusion of the District Court that the additional assessments for 1918 and 1920 were made within the proper statutory period as extended by the waivers.

Amortization.

One of the contentions upon which the plaintiff relies in support of its claim for refund is based upon the Commissioner's treatment of its claims under section 234 (a) (8) of the Revenue Act of 1918 (40 Stat. 1077). In order to reimburse those who had incurred capital expenditures in their business for war purposes, that act provides: "In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, * * * there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities * * * as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous Acts of Congress as a deduction in computing net income. * * *"

The plaintiff constructed, erected, installed, and acquired after April 6, 1917, certain buildings, machinery, equipment, and other facilities for the production of articles contributing to the prosecution of the war against the German government. With its income tax return for 1918, it filed a claim for a deduction from gross income on account of the amortization of the cost of such facilities.

One Griffith, an engineer of the amortization section of the Bureau of Internal Revenue, made an investigation of the facts set out in plaintiff's amortization claim, and about October 23, 1921, submitted a report in which he recommended an amortization allowance in the amount of $1,344,465.15. The report was approved by the chief of the amortization section. On December 2, 1921,

in response to a request by the plaintiff, a copy of the report was sent to it accompanied by a letter, which read as follows:

"Further reference is made to your letter of November 7, 1921, and reply from this office under date of November 9, 1921, making request for copy of report by the appraisal engineer who made investigation of the facilities involved in claim for amortization.

"Copy of the approved report submitted by the appraisal engineer is enclosed for your information.

"In transmitting a copy of this report, at the present time, upon request of the taxpayer, it is to be clearly understood that the merits of the case, and the correctness of the conclusions reached by the engineer, are not now to be made the subject of objection or conference, and that no further consideration can be given to the amortization claim until such time as the taxpayer is officially notified of the result of the complete audit and examination. Subsequent to transmittal of the usual formal letter, there is provided a thirty day period wherein any objections by the taxpayer may be properly presented for the consideration of this office. The amortization feature of the case may be taken up only at that time, together with any other matters which the taxpayer may then desire to present."

Subsequent to March 3, 1924, the matter was assigned for re-investigation to cne Luce, another appraisal engineer in the amortization section. His final recommendation, made November 17, 1926, modifying a prior report of November 4, 1925, was that the plaintiff be allowed an amortization deduction of $387,224.40. The Commissioner of Internal Revenue based his determination of the amortization allowance on the Luce report.

It is contended by the plaintiff that the amortization allowance had been determined following the Griffith report, and that any re-determination after March 2, 1924, was in violation of section 234 (a) (8) of the Revenue Act of 1921 (42 Stat. 254), which reads: " * * * At any time before March 3, 1924, the Commissioner may, and at the request of the taxpayer shall, reexamine the return, and if he then finds as a result of an appraisal or from other evidence that the deduction originally allowed was incorrect, the income, war-profits, and excess-profits taxes for the year or years affected shall be redetermined. * * * "

But that contention leaves out of consideration the effect of section 278 (b) of the Revenue Act of 1924 (26 USCA § 1059), which reads: "Any deficiency attributable to a change in a deduction tentatively allowed under * * * paragraph (8) of subdivision (a) of section 234, of the Revenue Act of 1918 or the Revenue Act of 1921, may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time."

We find no error in the finding and conclusion of the trial judge that the letter of December 2, 1921, fixed the deduction, reported by Griffith prior to March 3, 1924, as tentative and not final; nor in his conclusion of law that the power of determination had not yet passed from the Commissioner, and did not pass from him prior to his issue of the thirty-day letter.

The final allowance followed the Luce report in November, 1926. Section 234 (a) (8) of the act of 1921 applies only in those cases in which the Commissioner, having once determined and finally and not tentatively allowed the amortization deduction, then re-determines it. Under such circumstances the dead line is March 3, 1924. Under authority of section 278 (b), above cited, the Commissioner had power to determine the deduction tentatively allowed at any time, and to collect in accordance with such determination.

In the cases of Commissioner v. Ohio Falls D. & F. Works, 50 F.(2d) 660, and Norton Co. v. Commissioner, 50 F.(2d) 664, the Sixth and First Circuits decided on the facts before them that the right granted to the Commissioner by section 278 (b) to assess or collect deficiencies at any time was unavailable, since in each of those cases there had actually been more than a "tentative" allowance of the amortization deduction prior to March 3, 1924. In the instant case, the correspondence in the record and the finding of the trial judge convince us that any so-called allowance made immediately following the Griffith report and prior to March 3, 1924, was "tentative" within the meaning of section 278 (b).

In the court below, as previously indicated, the plaintiff contended that the method of computing the amortization allowance followed by the Commissioner was erroneous; and that the Commissioner improperly rejected claims for amortization upon the cost of a limestone dock and upon the cost of real estate purchased by the plaintiff during the war. Those subjects are discussed in the order named.

The plaintiff's plant had been enlarged by war-time facilities which were in excess of the needs of the plant during the post-war period, and it was therefore entitled to a deduction for amortization. The post-war period comprises the period between March 3, 1921, the date of the President's Proclamation, and March 3, 1924 (41 Stat. 1359). During that time the plaintiff's plant produced an average of 22, 597 tons of soda ash per month, and, for the year showing peak production, an average of 26,163 tons per month.

In order to ascertain the amount of the amortization allowance, the Commissioner proceeded to determine the "value in use" or the "residual value," as it is commonly termed, of the war-time facilities. For that purpose he used the ratio which the post-war production bore to the war-time capacity, taking as the numerator of the fraction, representing the ratio, the post-war production and as the denominator of the fraction the war-time plant capacity. The plaintiff had presented its claim to the Commissioner on the broad principles of this formula. The figures which it used were:

$$\frac{22,597}{45,017} \begin{cases} \text{tons per month (average post-war production per month)} \\ \text{tons per month (war-time capacity).} \end{cases}$$

The Commissioner substituted the following figures:

$$\frac{26,163}{33,250} \begin{cases} \text{tons per month (average per month of the post-war year showing peak production)} \\ \text{tons per month (war-time capacity).} \end{cases}$$

The District Court found from the evidence, as a fact, that the average war-time capacity of the plaintiff's plant was 33,250 tons per month and not 45,017 tons as claimed by the plaintiff. The Commissioner and the court took the average war-time monthly production of 33,250 tons as plant capacity. That method might be justified, if supported by the evidence. The witnesses, however, including the plaintiff's president, two industrial superintendents, and the former chief of the amortization section of the Bureau of Internal Revenue, unequivocally testified that the average monthly capacity of the plaintiff's plant was 45,017, and gave their reasons and the facts upon which they based their conclusion. The only testimony to the contrary was that of Luce. His testimony was based entirely on production records under war-time conditions. This was not a fair criterion by which to determine plant capacity. The court might have disbelieved the plaintiff's wit-

nesses, but he did not base his conclusions upon that ground. It is apparent that he ignored the testimony of skilled and experienced witnesses, based upon actual facts, and reached a conclusion contrary to their testimony, without any substantial evidence to sustain his conclusion. The question before him was not the average plant production during the war, but the plant capacity. The learned judge must be held in error in his adoption of the figure of 33,250 tons as plant capacity, instead of 45,017 tons.

The trial judge, in finding the numerator of the fraction representing the ratio which post-war production bore to war-time capacity, rejected the Commissioner's selection of the post-war year showing the peak production, and adopted the contention of the plaintiff that the numerator should represent the average production of the plant per month during the whole post-war period, and therefore, found the value in use to be

$$\frac{22,597}{33,250} \text{ or } 67+ \text{ per cent.}$$

Section 234 (a) (8) of the Revenue Act of 1918 provides that there shall be allowed "a reasonable deduction" for amortization. The regulations and the practice adopted by the Commissioner provide for arriving at a deduction through means of a ratio showing the relation of war-time capacity to post-war production. To be "reasonable," the allowance must be, as the term implies, just, fair, and equitable. The regulations of the Commissioner provide for using a ratio as a means of comparison, and that method would be just, fair, and equitable, if properly applied. But the term "ratio" in itself means the relation which one quantity has to another of the same kind. In attempting to fix a ratio, the Commissioner adopted a standard by which one term of the ratio (the numerator) is represented by the average production during one year only of the post-war period, that of peak production, and the other term (the denominator) by the monthly average production of the whole war-time period. The defendant contended vigorously for the figures representing the average monthly production during the war-time period, and prevailed in having his theory adopted and in obtaining a finding by the trial judge of the figures representing that standard. In attempting to arrive at the term of the ratio representing the post-war period, however, he urged the adoption of the average production during the peak year of that period and not during the whole peri-

od. We cannot agree that a just and fair relation between the two periods can be obtained by the inconsistent method proposed to be applied by the Commissioner and urged on his behalf by the defendant. In our view, in order to obtain a reasonable allowance which is just, fair, and equitable, the quotient should be that of the ratio of similar terms.

The Commissioner considered specific facilities or groups of facilities in computing the allowance. The plaintiff claimed that its plant was one harmonious unit, and that the extent of the use of the various facilities comprising the plant could not be determined separately or by departments, but only as a unit. All the pertinent facts were before the learned District Judge in his capacity as a fact finding tribunal. Under Rev. St. § 649 (28 USCA § 773), the findings of fact by a judge, in the event that a jury has been waived, have the same effect as the verdict of a jury. The findings will not be disturbed where there is any evidence to sustain them. Tarn v. United States, 16 F.(2d) 272 (C. C. A. 3); Ward v. Joslin, 186 U. S. 142, 23 S. Ct. 807, 809, 46 L. Ed. 1093. In the latter case it was said: "When a case is tried by the court without a jury, its findings on questions of fact are conclusive, although open to the contention that there was no evidence on which they could be based."

It nowhere appears that it was impossible to fix a value on the individual facilities, and no sound reason is advanced by the plaintiff to induce the court to reverse the Commissioner's action. No facts appear to support the plaintiff's contention that the absolute unity of the plant for amortization purposes is established. Section 234 (a) (8) of the Revenue Act of 1918 bases amortization upon "facilities" and not upon the aggregate of the facilities united in one plant. In United States v. Briggs Mfg. Co., 40 F. (2d) 425 (C. C. A. 2), specific facilities were considered by the Commissioner in determining the amortization allowance. In Appeal of Manville Jenckes Co., 4 B. T. A. 765, 795, it is said: "The deduction contemplated by the statute is 'a reasonable deduction for the amortization of such part of the cost of such (amortizable) facilities or vessels as has been borne by the taxpayer.' The deduction is in respect of specific facilities."

We find no error in the classification of facilities by the District Court.

The plaintiff purchased a limestone dock in 1917 at a cost of $340,000. The District Court permitted 32 per cent. amortization on the total cost of the dock. The Commissioner had disallowed any amortization. The defendant contends that the dock was purchased from an affiliated company, the Fairport, Painesville & Eastern Railroad Company, and that amortization does not apply to property transferred from one affiliated company to another. The record does not contain any proof convincing to the trial court that the plaintiff corporation was affiliated with that company in 1917, the year in which the dock was purchased. There is sufficient testimony to warrant the trial court's finding of fact that the limestone dock was in excess of the plaintiff's peacetime requirements. We therefore find no error in the allowance of 32 per cent. on the cost of the dock. In view of our approval of the allowance by the District Court of amortization on the cost of the dock, it is directed that the depreciation allowed by the Commissioner on the same cost be deducted from the determined amortized allowance.

The plaintiff claimed full amortization on the cost of land purchased by it at the total cost of $96,989.60 in 1917 and $108,979.50 in 1918. The purchase was made in order to settle actions for damages brought against the plaintiff by the owners of the land. It was conceded that no part of the plaintiff's plant was erected upon the land, and that it was wholly useless to the plaintiff both during and after the war. The Commissioner refused to make any allowance on the ground that land is not subject to amortization. The statute permits an amortization allowance on "buildings, machinery, equipment, or other facilities." Amortization is therefore limited to the facilities named or those *ejusdem generis*. United States v. Baumgartner (D. C.) 259 F. 722. Finally the land was not used for the production contemplated by Congress. The case of United States v. Corona Coal Co. (C. C. A.) 23 F.(2d) 673, cited by the plaintiff, is readily distinguished from the case at bar. In that case, amortization was allowed on the cost of a shaft driven through earth and rock to get at coal. A mining shaft is obviously a facility necessary to mining operations. The land for which amortization was claimed does not come within the class meant by Congress by the phrase "other facilities."

The District Court allocated the allowance for amortization over the years 1918 and 1919 in accordance with the percentages previously determined by the Commissioner. Article 185 of Regulations 62 of the Treasury Department provides that an

amortization allowance shall be apportioned in cases where the property was employed in the production of articles contributing to the prosecution of the war over the respective accounting periods of the taxpayer, having reasonable regard to the gross income and net income. The defendant contends that, since the court altered the income from that established by the Commissioner, through an additional amortization allowance, it should alter the percentage of such an allowance deductible in each year. The Regulations, however, provide that: "The amortization allowance shall be spread in proportion to the net income (computed without benefit of the amortization allowance). * . * * "

It is therefore obvious that the percentages for the years 1918 and 1919, as determined by the Commissioner, are unaffected by the increased amortization allowance.

Depreciation.

The Commissioner allowed a composite depreciation rate of 10.4 per cent. for all of the plaintiff's depreciable assets for the years 1917 and 1920, inclusive. This amounted to $437,262.55 for 1918, less than half the $876,366.71 claimed by the plaintiff. The District Court sustained the action of the Commissioner.

The plaintiff does not complain of the depreciation rate which was applied for 1917, 1919, and 1920, but insists that the rate for the year 1918 should be 20 per cent. or more. The basis for this contention is that, during that year, poor labor conditions, resulting in direct damage to and neglect of the machinery, inadequate repairs due to the lack of mechanics, and poor fuel, caused a rapid deterioration of the plant. Whether the amount the Commissioner caused to be deducted for depreciation under those circumstances was right is a question of fact. The burden of proving the contrary is on the taxpayer. We said in Rieck v. Heiner, 25 F.(2d) 453, 454 (certiorari denied 277 U. S. 608, 48 S. Ct. 603, 72 L. Ed. 1013): "Nor is there a burden on the Commissioner, when he has formally determined an amount of depreciation, to prove it right as a condition to sustaining the assessment by showing the investigation he has pursued and the matters that have influenced his judgment in arriving at it, for having found the depreciation and having made an assessment based on it, the law presumes his action right and the assessment prima facie valid."

The plaintiff did assume the burden of proving that the depreciation rate allowed by the Commissioner for 1918 was wrong, but, in the judgment of the trial judge, failed. We see no error in his conclusion.

The Revenue Acts of 1918 and 1921, § 234 (a) (7), 40 Stat. 1077; 42 Stat. 254, provide that, in computing the net income of a corporation subject to tax, "a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence," shall be made. While a "reasonable" allowance is not defined in the statutes, we have hereinabove defined it as one that is just, fair, and equitable.

Although the deduction allowable on account of depreciation is to be based upon the actual wear and tear sustained during that year, it is obvious that actual wear and tear of machinery and equipment is not ordinarily susceptible of scientific measurement in any one year. The Commissioner determined that the average life of the equipment in the plaintiff's plant was from nine to ten years, and therefore determined the composite depreciation allowance of 10.4 per cent. The plaintiff cannot take credit for an accelerated depreciation rate for the one year of 1918 without subjecting its taxes for 1917, 1919, and 1920 to revision by the Commissioner. The Commissioner's determination of the rate of depreciation will not be disturbed, in the absence of fact findings sufficient to convince us of error in law by the court below.

The plaintiff contends that it was entitled to a deduction for depreciation at the proper rate upon the unamortized cost of its war facilities. The defendant maintains that, in computing the residual value of the property, the depreciation factor had already been considered. The District Court did not pass upon this contention in its findings of fact or conclusions of law. In the absence of any reference in the briefs of either party to facts upon the record sustaining their respective contentions, we do not deem this question properly presented for decision.

Invested Capital for 1920.

The District Court filed its opinion February 10, 1930. At that time there was a judgment in favor of the plaintiff for an alleged overpayment of taxes for 1916 and 1917 in the case of Diamond Alkali Co. v. Heiner (D. C.) 39 F.(2d) 643. The basis for that judgment was that these taxes had been collected after the expiration of the appropriate statutory limitation period. Subsequent to the filing of the opinion of the District Court in the case at bar, an appeal,

taken by the defendant to this court from the judgment rendered in that case, was decided in favor of the defendant. See Heiner v. Diamond Alkali Co. (C. C. A.) 49 F.(2d) 120. That decision is sustained by that of the Supreme Court in Graham & Foster v. Goodcell, 282 U. S. 409, 51 S. Ct. 186, 75 L. Ed. 415. Since the judgment in favor of the plaintiff for the alleged overpayment of taxes for 1916 and 1917 has been reversed by this court, the plaintiff is not entitled to have the sum of $260,451.93 credited to its 1920 capital, as directed by the court below. The District Court was therefore in error in holding that the capital of the plaintiff for 1920 should be thus increased.

Special Assessment.

■ Upon application of the plaintiff, the Commissioner found that its excess profits tax for 1918, as determined without the benefit of section 327 of the Revenue Act of 1918 (40 Stat. 1093), would, owing to abnormal conditions affecting its capital or income, work upon it an exceptional hardship evidenced by gross disproportion between the tax computed without the benefit of the said section and the tax computed by reference to the representative corporations specified in section 328. The Commissioner determined the amount due as plaintiff's excess profits tax for 1918 as $2,084,324.26 on the basis of a net income of $3,821,143.63. The ratio of tax to net income therefor, as determined by the Commissioner, was 54.54 per cent. The plaintiff's contention in the District Court was that the rate of 54.54 per cent. was not justified by the evidence, and that the rate should be 45 per cent. The District Court having reduced the net income for 1918 and applied the rate determined by the Commissioner, to wit, 54.54 per cent., to the reduced income, the contention was abandoned. The defendant's position, on appeal, is that, the District Court being without jurisdiction to review the action of the Commissioner in determining whether a special assessment should be made under sections 327 and 328 of the Revenue Act of 1918 [Williamsport Wire Rope Co. v. United States, 277 U. S. 551, 48 S. Ct. 587, 72 L. Ed. 985; see, also, Cramer & King Co. v. Commissioner (C. C. A.) 41 F.(2d) 24], it follows that the Commissioner's action in determining the amount of the plaintiff's excess profits tax under sections 327 and 328 is not subject to judicial review.

In Brown's "Shamrock" Linens, Ltd., v. Bowers (D. C.) 41 F.(2d) 862, the Commissioner had allowed a special assessment and computed the excess profits tax in accordance with section 328 of the Revenue Act of 1918 at the rate of 44.8 per cent. of its net income. The taxpayer complained that the rate was excessive and should have been 25 per cent. The court there held that section 328 vested in the Commissioner administrative discretion in the computation of the tax, and that his discretion was not subject to judicial review. This ruling was affirmed by the Circuit Court for the Second Circuit in 48 F. (2d) 103. The question appears to have been settled by the Supreme Court in favor of the Commissioner's contention when it refused a certiorari in Brown's "Shamrock" Linens, Ltd., v. Bowers, Executor, 283 U. S. 865, 51 S. Ct. 657, 75 L. Ed. 1470.

The District Court was, therefore, in error in redetermining the amount of the excess profits tax fixed by the Commissioner.

Appeal No. 4427.

We have disposed of the questions involved in this appeal in the opinion upon appeals Nos. 4419 and 4426.

The cases will be remanded to the District Court for modification of its judgments in accordance with the foregoing opinion.

On Petition for Rehearing.

Marion N. Fisher, of New York City, for Diamond Alkali Co.

E. O. Hanson, of Washington, D. C., and John A. McCann, of Pittsburgh, Pa., for Heiner.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

The Diamond Alkali Company filed a petition for rehearing on two points and seeks:

1. To have the tax rate of 54.54 per cent. and 18.31 per cent., determined by the Commissioner in a special assessment to be the fair and just rate for this corporation for 1918 and 1919, respectively, applied to its income as reduced by the decision of this court.

2. A deduction for depreciation on so much of its war facilities as were not amortized.

These questions will be considered in the above order.

1. The taxes for 1918 and 1919 are involved. The Commissioner allowed a deduction for 1918 for amortization of war facili-

ties of $315,956.89 and for 1919 a deduction of $71,267.51. But this court on reversing the redetermination of the Board of Tax Appeals allowed a deduction for 1918 of $790,187.16 and a deduction for 1919 of $175,838.94, making a total allowance for both years of $966,026.10, instead of $327,224.40 allowed by the Commissioner. The net income of the petitioner, as determined by the Commissioner for 1918, was $3,921,143.63 and for 1919, $2,708,248.07. Applying the rate of 54.54 per cent. to the income of 1918 as determined by him, the Commissioner found that the company owed a profits tax of $2,084,324.26 for that year, and applying the rate of 18.31 per cent. to the income for 1919, he found it owed a profits tax of $495,871.87 for that year.

The net income of the petitioner for the two years was reduced by our former decision by $578,801.70, yet the Commissioner insists, and we held, that the total amount of the *tax* should not be reduced. If it is not reduced it would result in a tax rate of 61.62 per cent. for 1918 and a rate of 19.05 per cent. for 1919, instead of 54.54 per cent. and 18.31 per cent. for those years, respectively, as fixed by the Commissioner. This new rate would in effect be fixed by the court, which allowed deductions, but refused to apply the rate fixed by the Commissioner to the reduced income. In other words, if the contention of the collector prevails, the petitioner will pay the same tax for the two years that it would have paid if its taxable income had not been reduced by $578,801.70. The collector contends that although the corporation's income was reduced more than one-half million dollars, its tax must nevertheless remain the same for the reason that this court is without power to review the Commissioner's determination of the taxpayer's liability for taxes inasmuch as the taxes were determined by a special assessment.

 The allowance or denial of a special assessment provided for in sections 327 and 328 of the Revenue Act of 1918 (40 Stat. 1093) is an administrative question committed to the discretion or judgment of the Commissioner of Internal Revenue, subject, however, to review by the Board of Tax Appeals. Whether or not there are abnormal conditions affecting capital, as alleged in this case, or income which would work upon the corporation an exceptional hardship without the benefit of a special assessment; what are representative corporations to be used as comparatives, engaged in a like or similar trade or business; whether or not they are similarly circumstanced with respects to income, profits per unit of business transacted and capital employed, the amount and rate of war profits or excess profits, and all other relevant facts and circumstances—are questions for the sole determination of the Commissioner. Blair v. Oesterlein Machine Co., 275 U. S. 220, 48 S. Ct. 87, 72 L. Ed. 249; Williamsport Wire Rope Company v. United States, 277 U. S. 551, 559, 48 S. Ct. 587, 72 L. Ed. 985. They have been committed by Congress to his judgment and discretion which may not be exercised by the court. He has considered all these questions and in the light of all the facts has determined rates which must be accepted by the court as fixed, fair and just. In holding that the rates fixed by him shall be applied to the petitioner's true income, the court does not usurp the discretionary functions expressly conferred upon him.

 The collector raises the objection that if the Commissioner had not made a mistake in not allowing proper depreciation, other representative corporations might have been selected from which a different rate might have been fixed. This may or may not be true. It is purely supposititious. But when the Commissioner applied these rates found and fixed by him as the proper ones to an improper income and thus unjustly increased the taxes of the petitioner, the court does have power to order that the proper rate be applied to the proper income so that the taxpayer will pay only a proper and just tax. The power of the Commissioner to determine an abnormality, to select representative corporations as comparatives, to allow a special assessment, and fix the rate thereof, does not carry with it, power so to fix the income on which the profits tax must be computed that an admittedly unjust amount of the tax is put beyond the review of the court. It is a bare possibility that the reduction of the income to the proper and just amount might have some conceivable effect on the selection of representative corporations. That was a matter for the Commissioner, but when he found the correct rate, he could not apply it to an incorrect and false income and produce an unjust tax.

2. The second question is whether or not the taxpayer should have been allowed depreciation on so much of the war facilities as were not amortized.

The taxpayer's contention is tersely presented in the following statement:

1. Facilities Based on Production of Soda Ash

1917 cost less depreciation.... $543,082.60
Amortization allowed, 49.803%
of cost ................... 270,473.60

Unamortized cost ............ $272,609.00

1918 cost ...................$1,002,144.35
Amortization allowed, 49.8034%
of cost ................... 499,101.96

Unamortized cost ............$ 503,042.39

2. Boiler House Equipment

1917 cost ................... $56,583.88
Amortization 15% ........... 8,487.58

Unamortized cost ............ $48,096.30

1918 cost .................. $140,015.57
Amortization 15% ........... 21,002.34

Unamortized cost ............ $129,013.23

3. Flaking Machine

1918 cost .................. $2,880.00
Amortization allowed ........ 1,631.81

Unamortized cost ............ $1,248.19

4. Six Tank Cars

1918 cost .................. $23,655.00
Amortization allowed ....... 13,402.92

Unamortized cost ........... $10,252.08

1917 Unamortized Costs on which Depreciation at 10.4% is claimed.
 (1) $272,609.00
 (2) 48,096.30

 $320,705.30

10.4% of above is $33,353.35

1918 Unamortized Costs on which Depreciation at 5.2% is Claimed.
 (1) $503,042.39
 (2) 129,013.23
 (3) 1,248.19
 (4) 10,252.08

 $643,555.89

5.2% of above is $33,464.91.

The Commissioner did not allow any amortization on the limestone dock which cost $340,000, but the District Court did allow amortization at the rate of 32 per cent. or a deduction of $108,800. This much of the cost of the limestone dock which has been allowed by way of amortization should not be included in the depreciation base, for the Commissioner had already allowed depreciation at the rate of 10.4 per cent. on the entire cost of $340,000. Therefore, 10.4 per cent. of the amortized cost should be deducted from any additional depreciation. This is 10.4 per cent. of $108,800, or $11,315.20.

The total additional depreciation claimed by the taxpayer is therefore as follows:
10.4% of unamortized 1917 costs..$33,353.35
5.2% of unamortized 1918 costs.. 33,464.91

 $66,818.26
Less 10.4% of $108,800, amortized
cost of dock ................$11,315.20

Additional depreciation ........$55,503.06

There is no contention, if we correctly understand the parties, that the above statement is not correct as to amounts and rate of depreciation, if depreciation is to be allowed in addition to allowance for amortization.

■ There is a question, however, as to whether or not amortization was intended to exclude depreciation for obsolescence or wear and tear. This is shown by the legislative history of the sections in question of the Revenue Act of 1918 (40 Stat. 1077) which controls this case. The Committee on Ways and Means, having charge of this measure, in its report, said that many facilities provided for war purposes would be of little value after the end of the war; that under the law then existing, it was impossible to allow deductions other than for "ordinary exhaustion, wear and tear, and depletion of such property"; and that the purpose of the provision was "to allow special amounts for amortization, according to the peculiar conditions in each case." House Report 767, 65th Congress, 2d Session, p. 10; Senate Report 617, 65th Congress, 3d Session, p. 7. It is thus evidence that the allowance for amortization was not intended to exclude allowance for depreciation on unamortized war facilities. This question is settled by the case of the United States Cartridge Company v. United States, 284 U. S. 511, 516, 52 S. Ct. 243, 245, 76 L. Ed. 431, where the Supreme Court in construing this provision said that "deductions for amortization were not intended to exclude obsolescence, but rather were to be made in addition or having regard to allowances deducted on account of obsolescence and the like."

The record, it seems to us, shows that the allowances made were for amortization only and not for depreciation for exhaustion, wear, tear, and obsolescence for the year 1918. The taxpayer is entitled to a deduction for depreciation for exhaustion, wear, tear, and obsolescence on its unamortized war facilities. No question has been raised as to the correctness of the composite rate of 10.4 per cent. for depreciation, for exhaustion, etc., on war facilities installed in 1917 and 5.2 per cent. on those installed in 1918.

The order of the court is that the rates fixed by the Commissioner for the years 1918 and 1919 will be applied to the reduced income, and that the order of the District Court denying deductions for depreciation on unamortized war facilities is reversed.

THOMPSON, Circuit Judge, dissents.