**McKEEVER v. EATON, Collector of Internal Revenue.**

**SAME v. UNITED STATES.**

Nos. 3379, 3380.

District Court, D. Connecticut.

April 21, 1934.

Donald Horne, of New York City, for plaintiff.

R. P. Herzog, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., and George H. Cohen, Asst. U. S. Atty., of Hartford, Conn., for defendants.

THOMAS, District Judge.

These are two actions brought to recover an alleged excess of income and profits taxes paid by the British American Manufacturing Company for the years 1918 and 1919.

On June 14, 1919, the taxpayer filed its income and profits tax return for the year 1918, disclosing a tax liability which, with interest, aggregated $42,291.38, which sum was paid in installments from March 19, 1919, to January 19, 1920. For the year 1919 the taxpayer filed its return on March 15, 1920, showing a net income of $1,769.97, and no taxes were paid for this year.

On March 17, 1923, the Commissioner addressed a letter to the taxpayer, advising it of a proposed assessment of additional taxes. The taxes were thereafter assessed in April, 1923. Notice and demand were made for the payment of these assessments.

On May 10, 1923, the taxpayer filed a claim in abatement of the assessments. Upon the filing of this claim in abatement, collection was withheld.

I find that on or about February 3, 1924, the taxpayer submitted to the Commissioner a protest against the amount of the allowance that had theretofore been made for claimed amortization.

I find that there was received by the Commissioner on the 26th day of February, 1924, a document entitled "Statement of Appeal," which was sworn to February 25th on behalf of the taxpayer. In this statement, exception was taken to the failure of the Commissioner to make allowance for depreciation of certain machinery used by the taxpayer, as well as to the failure to give adequate credit for invested capital. No claim was embodied therein for amortization of war facilities.

The taxpayer also asserted that the excess profits tax proposed by the Department for 1918 was 63 per cent. of the net income of that year, which tax "is abnormal and is in excess of that paid by representative concerns," etc. Abnormality of the size of the tax was also claimed for 1919, and as to both it was "therefore requested that the company's excess profit tax be computed under the provisions of sections 327, 328 of the Revenue Act of 1918."

To this request the Commissioner, by a letter dated April 14, 1924, replied to the effect that before consideration could be given thereto, the taxpayer would have to file, within fifteen days therefrom, a written acquiescence in the net income as disclosed in the schedules annexed to the letter, or submit such exceptions as the taxpayer might take thereto. No such acquiescence or exceptions, responsive to this letter, were ever filed.

On March 14th a claim for refund was filed for the year 1918. This claim, however, did not purport to do anything else than to refer to an application that had already been made to have the company taxed under the provisions of sections 327 and 328 of the Revenue Act of 1918 (40 Stat. 1093). The only language of any materiality in this statement of March 14th is as follows:

"Assessments under sections 327, 328 based upon the tax paid by representative corporations, will, we believe, result in a tax which will indicate a refund for the year 1918 of the sum of approximately $33,000.00, for which the annexed claim is filed."

By a letter dated the 26th day of August, 1924, the Commissioner referred to taxpayer's application under the provisions of sections 327 and 328 of the Act of 1918, as well as to claim for refund of the 1918 tax and for the abatement of the 1919 tax, and then went on to say:

"After careful consideration and review, your application for assessment of your profits tax under the provisions of Section 328 of the Revenue Act of 1918, has been allowed."

The Commissioner thereupon proceeded to find the net income for 1918, as shown by his communication of April 14, 1924, and applied a 12 per cent. rate thereto, and found an overassessment for the year 1918 in the sum of $8,278.32. For the year 1919 he applied a rate of 10 per cent. to the net income shown in the letter of April 14, 1924, and found an overassessment of $7,408.63. He thereupon notified the taxpayer that thirty days

was granted within which to present a protest.

What had transpired between April 14th and August 26th does not appear. Nor is there any indication as to precisely what did happen upon the receipt of the communication of August 26, 1924. Nor is there anything to indicate what action was taken by the taxpayer from August 26, 1924, until the 5th day of January, 1925, when it executed new claims for refund for the years 1918 and 1919, in which all the taxes paid by it for those years were claimed and in which five general grounds were set out in support of the claim as follows:

(1) Adjustment of depreciation; (2) amortization of war facilities; (3) adjustment of invested capital; (4) restoration of items disallowed as deductions; and (5) loss of use for value and obsolescence and other discrepancies in the return.

It appears from the testimony that these claims for refund were in fact mailed on the date that they were executed, accompanied by a letter to the Collector of Internal Revenue at Hartford. Why they were mailed to Hartford, and not to Washington, does not appear. However, they were returned by the Collector with the request that the taxpayer submit a certified copy of the order appointing the receiver. They were thereupon returned to the Collector with the statement that he had on file already a copy of such order, showing the authority of the receiver in the premises. The claims for refund bear upon their face the Collector's stamp, showing that they were received by him August 25, 1925. However, in view of the fact that the sworn testimony of the witness as to the date when they were mailed is not contradicted, I find that they were actually transmitted to the Collector and received by him some time in January, 1925.

It is obvious, then, from this, that the taxpayer did not accept special assessment under sections 327 and 328; in fact, proceeded to treat them as if they were nonexistent and filed a claim for refund of taxes on grounds that error had been committed in computing the tax. It appears that on March 26, 1926, and again on June 25, 1926, the Collector at Hartford requested a certificate of the appointment of a receiver.

On September 2, 1926, the receiver, alluding to the letter of August 26, 1924, inquired as to why he had not received the refund of taxes, to which the Collector at Hartford replied that the same had been credited against the outstanding tax of 1919.

On May 6, 1927, the Treasury Department acknowledged some communication dated April 27, 1927, and stated that the Department had adjusted the claim for refunds by the issuance of a certificate dated December 10, 1924, and that on March 7, 1925, a check in the amount of $1,705.38 had been forwarded to the Collector of Internal Revenue for transmittal to the taxpayer.

On June 9, 1927, the taxpayer wrote the Commissioner, enclosing a brief in support of a claim for refund. The brief purported to be in support "of claim for refund as claimed in a letter dated February 3, 1924, and on form 843 filed on January 25, 1925, with the Collector of Internal Revenue." This brief largely concerned itself with a claim for deductions based on amortization of war facilities.

On July 12, 1927, an additional brief was submitted, with a claim for refund, in support of such claims as were already filed. This brief concerned itself with the question of an alleged erroneous determination of invested capital and alleged erroneous disallowances of certain deductions.

On August 11, 1927, the Commissioner acknowledged the receipt of the letter of July 12, 1927 (called July 13), and a brief in support of the claim for refund, with the statement that an examination of the brief did not warrant the allowance of the claim.

On October 31, 1927, the Commissioner addressed a letter to the taxpayer, referring to a claim for refund based on the alleged failure of the taxpayer to take proper deductions for amortization of war facilities. The claim was rejected on the ground that it was belated.

On November 9, 1927, the taxpayer protested against this decision in an elaborate brief; and on November 14, 1927, the Commissioner reiterated his position that the claim for deduction on amortization of war facilities was belated.

On February 11, 1928, the Treasury Department wrote to the receiver, stating that the claims for refund were being taken up with the taxpayer and not with the receiver, because there was no record in their office of the appointment of the receiver.

Again, on March 28, 1928, the receiver was advised that the case was transferred to the Internal Revenue agent in charge at the Custom House, where it might be handled more expeditiously.

On June 27, 1928, an elaborate supplemental brief, involving a close analysis of all the factual elements, all in support of claims theretofore made, was duly submitted to the Treasury Department.

On August 24, 1928, the Treasury Department replied. It acknowledged that the claims were based upon five separate grounds, including adjustment of invested capital, amortization of war facilities, and other matters. All of the claims, excepting the claim for amortization of war facilities, were rejected upon the ground that the taxpayer had no books and records available to verify its contentions. As for the claim based on amortization of war facilities, that was rejected because it was not filed prior to March 3, 1924.

Correspondence continued between the taxpayer and the Department, and the claim for refund was finally rejected on November 3, 1928.

A question of fact has arisen with reference to a claimed notification by the taxpayer to the government, by letter dated February 3, 1924, of a claim for readjustment of an allowance for amortization on war facilities. I have examined the actual carbon copy of a letter of February 3, 1924, in connection with the carbon copies of other letters, the authenticity of which is undoubted, and I conclude that the carbon copy is contemporaneous with its purported date. There is also adequate testimony in the record to convince me that the original was mailed to the Commissioner of Internal Revenue on or about February 3, 1924. The record discloses several instances where documents mailed to the Department were claimed not to have been received by it. Nevertheless photostatic copies thereof have been furnished by the Commissioner of Internal Revenue, indicating that in spite of the claim that the documents had not been received, they had in fact been received. I make the finding, therefore, as a finding of fact, that on or about February 3, 1924, a notification was received from the taxpayer by the Commissioner of Internal Revenue, of a claim based on an erroneous computation of deductions for war facilities, which claim embodied the categorical statement that the taxpayer had spent the approximate sum of $225,000 for the acquisition of war facilities.

█ It would have been wholly unnecessary in this opinion to have set forth such an extended statement of the nature of the correspondence had between the taxpayer and the government, had it not been for the claim by the defendant that the award of special assessment under sections 327 and 328 of the Revenue Act of 1918, barred all further

claim by the plaintiff. In this connection, the government claims that the case of Heiner v. Diamond Alkali Co., 288 U. S. 502, 53 S. Ct. 413, 77 L. Ed. 921, rules the case at bar. I think that a proper understanding of this case involves a consideration of two other cases; one decided prior to the Diamond Alkali Case and the other contemporaneously with it.

The first case was United States v. Henry Prentiss & Co., Inc., 288 U. S. 73, 53 S. Ct. 283, 77 L. Ed. 626. There suit had been brought to recover overpayments of taxes due to undervaluation by the Commissioner of the taxpayer's invested capital. The taxpayer had filed a claim for refund on the ground that, owing to abnormal conditions, there could be no fair computation of the invested capital, and it asked for a special assessment under the provisions of sections 327 and 328 of the Revenue Act of 1918. The Commissioner replied by saying that the request for special assessment would not be considered "until statutory net income and invested capital are definitely determined. It is therefore necessary that you acquiesce in the net income and invested capital as shown in the revenue agent's report of March 25, 1920, for the year 1918, or submit exceptions, if any, which you may take thereto." Pages 81 and 82 of 288 U. S., 53 S. Ct. 283, 284.

The plaintiff took no exception, nor did he appeal. Mr. Justice Cardozo, speaking for the court, said, at page 82 of 288 U. S., 53 S. Ct. 283, 284:

"What the respondent chose to do was obviously to acquiesce in the report that the cash value of the capital had been fairly ascertained, and to take its stand on the position that under sections 327 and 328 its tax should be determined without reference to such value and in accordance with other methods both exceptional and discretionary."

The Commissioner determined that there was no error in refusing to grant special assessment and rejected the claim therefor. However, the case was kept open and the solicitor wrote that his office had before it an application for special assessment, and asked if the taxpayer desired to be heard. The taxpayer did get an oral hearing, at which he filed an amended proof of claim and put before the Commissioner evidence of undervaluation of real estate and exclusion of intangibles in the estimate of invested capital. The Commissioner again rejected the claim on the ground that it was belated.

The court held that the claim based upon the improper evaluation of the invested capital was made to the Commissioner after the time for making such claim had expired, and that the taxpayer could not make such claim merely in the guise of an amendment to its original claim for special assessment. In this connection the court said:

"A statement, without explanation, to the effect that overpayments have been made in an aggregate amount is broad enough to cover any and all grounds for reassessment and return. This at all events is true where the basis of the grievance is that the tax has been erroneously computed even by the normal method, that there has been a deviation, in other words, from the statutory rule. Such is not the claim in controversy here. Here the taxpayer by its claim as originally presented abandoned the position that there had been any error of fact or law in the assessment of the tax according to the normal method, and planted itself on the position that the special method would be fairer. We are to say whether the ground thus deserted may be recovered by amendment."

And the court held that the ground "thus deserted" could not be recovered by amendment.

Then came the case of Heiner v. Diamond Alkali Co., 288 U. S. 502, 53 S. Ct. 413, 77 L. Ed. 921, relied upon by the government. The best exposition of the problem involved in that case is found in the words of Justice Roberts, who wrote the opinion. On page 503 of 288 U. S., 53 S. Ct. 413, he presents the problem in the following way:

"These cases present the question whether, where the Commissioner of Internal Revenue has granted special assessments of profits taxes pursuant to section 328 of the Revenue Act of 1918 (40 Stat. 1093), a court, in an action for a refund, may recalculate the taxpayer's net income and recompute the tax by applying to the corrected net income the rate per cent. used by the Commissioner in his computation of the tax."

In that case the taxpayer filed returns for the years 1918 and 1919 and paid the taxes. The Commissioner proposed certain changes, whereupon the taxpayer asked for a special assessment. This request was denied at first, but finally granted, and the Commissioner communicated his calculation of taxes, to which plaintiff took exception. The Commissioner then made an assessment according to his findings, and demanded payment of the deficiency which was paid under protest. The taxpayer then brought suit and the District Court found that additional amounts should have been allowed for amortization, and then reduced the net income as determined, and thereupon recomputed the taxes on

the reduced income by applying the percentage rates used by the Commissioner in his computation and rendered judgment in favor of the plaintiff. Upon an appeal to the Circuit Court of Appeals, 60 F.(2d) 505, that court allowed still further deductions from the income, and to said net income as so determined, applied the rate used by the Commissioner in his special assessment. On page 505 of 288 U. S., 53 S. Ct. 413, 414, Mr. Justice Roberts said:

"In Williamsport Wire Rope Company v. U. S., 277 U. S. 551, 48 S. Ct. 587, 72 L. Ed. 985, it was decided that the allowance of special assessment is a matter of administrative discretion; and it was further said that the selection for comparison of representative corporations engaged in a like or similar trade or business is also a question of discretion. The Commissioner cannot make an administrative finding upon the question for decision under section 327 (d) or that under 328 until he has determined the net income of the taxpayer. See U. S. v. Henry Prentiss & Co., 288 U. S. 73, 53 S. Ct. 283, 77 L. Ed. 626."

And on page 507 of 288 U. S., 53 S. Ct. 413, 415:

"The grant of special assessment and the ascertainment of the rate or ratio of tax to be applied to the net income of the taxpayer are indissolubly connected by the terms of the statute. The exercise of the discretion in both aspects is committed to the Commissioner and to the Board of Tax Appeals upon review of his action. That discretion cannot be reviewed by the courts, nor exercised by them in place of the administrative officer designated by law. It is beyond the power of a court to usurp the Commissioner's function of finding that special assessment should be accorded, and equally so to substitute its discretion for his as to the factors to be used in computing the tax. The courts below were in error in adopting the rate chosen by the Commissioner and applying it to a net income other than that which he used in making his comparisons and arriving at the rate."

In the case of Bemis Bro. Bag Co. v. United States, 289 U. S. 28, on page 29, 53 S. Ct. 454, 455, 77 L. Ed. 1011, which case is relied upon by the plaintiff at bar, speaking for the court, Mr. Justice Cardozo said:

"There is need once again to decide whether a claim for the refund of a tax has been presented by the taxpayer in such a form as to be subject to amendment after a claim wholly new would be barred by limitation."

Here the taxpayer, having paid, filed a claim for refund and requested special assessment. The right to such relief was placed upon three separate grounds. The first was that the Commissioner was unable to determine invested capital in the ordinary way. The second was that the mixed aggregate of tangibles and intangibles paid for in capital stock was such that the Commissioner would be unable to determine the respective values of the several classes of property. The third was such abnormality of conditions as should move the Commissioner to make special assessment.

As to each of these grounds, the taxpayer submitted an itemized statement of facts which showed a factual basis for claims for refunds based upon erroneous determinations of fact. The court said that grounds numbered one and two gave notice to the Commissioner that the taxpayer's invested capital had been erroneously assessed and charged him with the duty to inquire into the error and to give appropriate relief. The Commissioner notified the taxpayer that there was no evidence under sections 327 (d) to warrant special assessment on the ground of abnormal conditions. He overlooked the fact that the taxpayer was also claiming relief under section 327 (a) and (c). The taxpayer protested and amended his claim to demand relief in the alternative; in the event that special assessment was denied, then that "items improperly eliminated from invested capital should be restored to invested capital, and the excess profits tax recalculated on that basis."

Upon reconsideration the Commissioner held that there had been an undervaluation of invested capital but that the demand for refund as first presented was defective and that the amendment came too late. On page 32 of 289 U. S., 53 S. Ct. 454, 456, Mr. Justice Cardozo said:

"We held in United States v. Henry Prentiss & Co., supra, that, after the period of limitation, a claim for a special assessment under section 327 (d) may not be turned by amendment into one for the reaudit of invested capital and for the reassessment of the tax accordingly. The two proceedings, it was pointed out, are essentially diverse."

It was then held that the prayer for relief embodied in the taxpayer's protest did not necessarily determine the rights of the taxpayer, and that if the Commissioner was duly apprised by the statement of the claim that error had been committed by him in his computation, he was bound to proceed to inquiry and to determination of that error.

With these three cases in mind, we now turn to the facts of the case at bar. To start

with, it is obvious that the plaintiff does not take the position taken by the taxpayer in the Diamond Alkali Case. He is not asking that the rate used by the Commissioner in making his special assessment should be applied to a different base. In fact, he is ignoring the special assessment entirely. He is asking for no relief under such special assessment. The theory of the Diamond Alkali Case was obviously that the taxpayer could not accept part of the benefits of the special assessment and object to the rest. Whether it was the rate of the assessment or the base against which the rate was computed, if he accepted one, he was bound to accept the other. For this reason I do not regard the Diamond Alkali Case as applicable to the case at bar.

In the Prentiss Case the real question was not whether the acceptance of special assessment barred suit, but, rather, whether having claimed nothing more than special assessment, the taxpayer was in a position after the period of limitation expired, to amend his claim from a claim for special assessment into a claim of error in fact and law in the computation of his tax. The court held that such amendment was for an inadmissible "transfiguration." In the Bemis Case the original prayer was° for special assessment, but the facts embodied in the protest showed errors in fact and law in the computation of the tax, and the special assessment was not allowed.

It thus appears that none of the three cases embody the situation presented in the case at bar. This case is distinguishable from the Diamond Alkali Case by the fact that here the taxpayer completely ignores the special assessment, seems never to have in any sense accepted the same, and is not asking this court to apply the rate of tax determined upon by the Commissioner in his special assessment to a base different from that found by him. On the other hand, it is also distinguishable from the Bemis Case by the fact that in the Bemis Case the special assessment was refused, whereas in the case at bar the special assessment was actually made. However, I find from the entire record the following:

1. That the Commissioner was adequately apprised, prior to the making of his special assessment, of the various grounds upon which error was claimed in his computation of the tax.

2. That, while it is true that the prayer for a special assessment was granted and the tax computed accordingly, the taxpayer did not in fact acquiesce in the decision arrived at by the Commissioner, but, on the contrary, consistently kept on claiming errors in the computation of the tax, based upon errors of fact and law.

3. That the Commissioner never took the position that his special assessment concluded the matter but, on the contrary, kept the case open and kept on re-examining the situation upon the merits for several years after the special assessment had been made. By the merits in this connection I mean not the merits with relation to special assessment, but the merits of the claims of errors in fact and in law in his computation of the tax.

Upon this record I therefore reach the conclusion that the making of the special assessment does not constitute a bar to the prosecution of this suit.

The claim is further made that the action is barred by the statute of limitations. I find upon all the facts that the essential claims of the plaintiff were finally rejected by the Commissioner on November 3, 1928, and that suit was brought within two years thereafter.

█ This brings us to a consideration of the merits. British American Manufacturing Company was organized in November, 1919, with a capital stock of 3,000 shares, having a par value of $100 per share. On December 16, 1913, the entire capital stock was issued to E. A. Brinckerhoff and William M. McIntosh for the transfer of certain secret processes in rubberizing. The aggregate value of these processes was the par value of the stock issued in exchange therefor. The stockholders thereupon donated 2,988 shares to the corporation to be used in the raising of working capital with which to begin operations. The two stockholders had obtained an option on a plant of the Interstate Rubber Company and the taxpayer purchased such rights by reissuing to each of its stockholders 752 shares. It also, for the transfer of the plant, assumed a mortgage of $7,000 and notes in the sum of $20,000. The balance of the treasury stock was sold at various times at par.

The contentions made by the plaintiff for the year 1918 are as follows:

It claims too low a calculation on its invested capital; inadequacy in the allowance of amortization of war facilities; inadequacy in the allowance for obsolescence; illegal elimination of a $12,000 item of expense for the rental of a certain calender machine.

For the year 1919 we have practically the same objections, excepting that there is no question of amortization of war facilities, and there is an illegal deduction claimed of $37,000 expenses by way of commissions.

It would extend the bounds of this opinion beyond all due limits if the court were to indulge in further analyses of the evidence. I limit myself, therefore, to findings.

I find that, for the years 1918 and 1919, the invested capital was the sum of $132,000, made up of the items of $57,000 tangible assets and 25 per cent. of $300,000 of capital stock issued for secret process rights. As to the item for tangible assets, I find that this investment was carried on the books at $57,-000 for several years. I am not persuaded that there is adequate testimony to offset the taxpayer's own valuations during those years.

As for the intangibles, I find that the full amount of $300,000 of stock was issued for these secret process rights in the rubber processing of textiles, and I find that this stock was bona fide issued at this valuation for these process rights.

As to the claim for amortization for war facilities, I find that the total expenditures for war facilities were the sum of $196,317.-17, against which $43,895.15 has already been allowed as a deduction. The subject of amortization of war facilities is indeed a very thorny one, and I agree with the contention of counsel for the plaintiff that the term "amortization" as used in connection with war facilities is not to be construed as obsolescence or depreciation, as any such construction would delete all meaning out of the term. That Congress did not here indulge in strictly scientific terminology is apparent enough; but unless some significance be attached to the term "amortization," different from obsolescence, the statute is meaningless.

Nor am I persuaded that, under the regulatory power conferred by Congress upon the Commissioner of Internal Revenue, any delegation of legislative authority was or could have been made. The government relies upon certain rules and regulations promulgated by the Commissioner of Internal Revenue which, in the opinion of the United States Attorney "provide the manner in which such allowance should be determined." The word "manner" here is exceedingly ambiguous. If by that term is meant the forms upon which such claim should be made and the procedure necessary to place the claim before the Commissioner, then there can be no question about the authority of the Commissioner to make such rules. But if the term "manner" is construed as intending to convey the idea that the Congress has devolved upon the Commissioner the power to determine the incidence of the tax and its quantum by way of an ostensible exercise in interpretation, then

I cannot follow the argument. By section 234 (a), subd. 7, of the Revenue Act of 1918 (40 Stat. 1078), provision is made for "a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence."

By subdivision 8, further provision is made:

"In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war * * * there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous Acts of Congress as a deduction in computing net income."

The legislative mandate here is to allow "a reasonable deduction for the amortization of such part of the cost" etc. I cannot conceive that there is vested in the Commissioner of Internal Revenue any power, either by interpretative decisions or by interpretative "rules and regulations," to abate by one minim the full strength of this mandate.

■ I find that further allowance for amortization should be made for the year 1918 in the sum of $152,422.58.

■ The claim for deduction based on alleged error in striking out the deduction of $12,000 for the use of the calender machine for 1918 and 1919 is disallowed.

I find that there was a pro forma arrangement under which the president of the company, Mr. Brinckerhoff, leased this machine at an alleged annual rental of $12,000, but I cannot persuade myself that there was in essence any such arrangement. Plaintiff admitted that the total cost of the machine was $25,000 including installation, and that the machine had a life use of twenty-five years. Some time in 1920 the machine itself is alleged to have been sold to the company, but for what price does not appear.

Considering the following factors:

(a) The close relation of the president of the company to which he was "renting" the machine. (b) The utter disproportion between the reasonable value of the use of the machine and the actual alleged rental exacted therefor. I am of the opinion that the whole arrangement was in essence fictitious, and for that reason I reject the claim made as to this item.

Nor am I able to follow plaintiff's counsel on his theory of obsolescence. He claims a prewar cost of tangibles of $177,400, and secret processes valued at $300,000, making a total of $477,400 which he claims became valueless after the war. The further claim is then advanced that this loss "should be deducted over 1918–1919 pro rata." I have already found that the value of the tangibles was $57,000. I cannot understand what is meant by the "obsolescence" of a rubberizing process, unless there is evidence in the record to show that newer and better processes have since that time been invented which render the process at bar obsolete. Of course, there is no such testimony in the record.

Nor am I able to understand why, if the entire invested capital is to be deducted for obsolescence, any allowance of any kind should be made for invested capital. It appears to me that the taxpayer cannot have it both ways. The claim, therefore, for obsolescence is disallowed.

Nor am I able to find any basis for allowing the commissions of $37,136.88 to the Leather Coat Company. The term "company" here is a misnomer; it was merely the trade-name of the president of the company. I regard payment of such commissions, under the circumstances disclosed in this case, as nothing more than a distribution of dividends.

Counsel for the plaintiff will submit an order incorporating the findings of fact as herein outlined; and counsel for the plaintiff and defendant will recalculate the tax in accordance therewith and embody the conclusions in said final decree. Submit order accordingly.