638

This case having been heard by the Court of Claims, the court, upon the evidence adduced, makes the following special findings of fact:

1. Plaintiff is a Missouri corporation with its principal office and place of business in St. Louis where it is engaged in the printing and binding business, specializing in printing forms commonly used by railroads, such as rate and tariff schedules, waybills, bills of lading, etc.

2. March 15, 1921, plaintiff filed its income and profits tax return for 1920 showing a net income of $333,279.25 and a tax liability of $77,284.72, which latter amount was paid in four equal installments of $19,321.18 on March 16, June 14, September 15, and December 15, 1921. Among the deductions taken by plaintiff on its return were the following: .

Subscription to the endowment fund of St. Louis University (deducted as advertising) .......................................... $ 10,000.00
Depreciation ................................. 94,810.86
Obsolescence—standing type and forms... 171,789.83

3. November 10, 1925, and September 23, 1926, plaintiff filed waivers which extended the period for assessment for 1920 to December 31, 1926, and December 31, 1927, respectively.

4. During 1925 an examination was made of plaintiff's return for 1920 by a revenue agent and an additional tax recommended of $145,905.88. Among the items which gave rise to the proposed additional tax were the disallowance of the subscription to the endowment fund of St. Louis University of $10,000, a reduction of the depreciation claimed from $94,810.86 to $26,322.20, and the disallowance of the deduction of $171,789.83 for obsolescence of standing type and forms. Invested capital was also reduced by $235,478.60, an amount set up on plaintiff's books in 1913 on the basis of the appraisal in 1910, representing labor costs entering into standing type and forms, as hereinafter more fully described.

5. December 10, 1925, plaintiff protested the proposed determination as set out in finding 4 on account of the various changes recommended by the revenue agent, and in addition asked that its profits tax for 1920 be computed under the provisions of section 328 of the Revenue Act of 1918, because "'exceptional hardship' exists in the taxpayer's case as evidenced by the gross disproportion between the profits tax for 1920 of representative concerns as defined in section 328 and the profits tax of this taxpayer computed without the benefit of sections 327 and 328. * * *" The "exceptional hardship" was said to arise because of abnormal conditions affecting both income and invested capital. The request for special assessment was renewed on the same or similar grounds in plaintiff's protests of November 4, 1926, March 26, 1927, and June 1, 1927.

6. By a 60-day letter dated September 19, 1927, the Commissioner of Internal Revenue advised plaintiff of the determination of a deficiency for 1920 of $126,082.34. In that determination the Commissioner disallowed the deduction claimed of $10,000 on account of the subscription to the endowment fund of St. Louis University;

$171,789.83, obsolescence of standing type and forms; and $38,344.96 of the depreciation claimed on the original return. In fixing plaintiff's invested capital in the same determination, the Commissioner excluded the item of $235,478.60 heretofore referred to as representing the cost of standing type and forms. In that determination plaintiff's application for special assessment was denied.

Shortly after the receipt of the letter of September 19, 1927, plaintiff on September 23, 1927, made application to the special advisory committee of the Commissioner's office for further consideration of its case, and at that time requested that the following items be considered:

(1) Reduction of invested capital in the amount of $235,478.60 on account of standing type and forms.

(2) Disallowance of a deduction of $171,789.83 on account of obsolescence of standing type and forms.

(3) Disallowance of a deduction of $12,-097.55 for advertising, which included the subscription to St. Louis University of $10,000.

(4) "The disallowance by the Department of the taxpayer's application for assessment under sections 327 and 328 of the Revenue Act of 1918 for the year 1920. The taxpayer's position on this phase is set forth in brief of March 26, 1927, and supplement thereto of June 1, 1927."

Thereafter the special advisory committee granted a conference to counsel for plaintiff, and, after further consideration, a deficiency was determined for 1920 of $105,685.01. In connection with such determination plaintiff executed the following waiver of a right to file a petition with the United States Board of Tax Appeals; such waiver being dated November 8, 1927:

"The undersigned taxpayer hereby waives the right to file a petition with the U. S. Board of Tax Appeals under section 274(a) of the Revenue Act of 1926 [44 Stat. 55] and consents to the assessment and collection of a deficiency in tax for the calendar year 1920 aggregating $105,-685.01.

"This waiver is not intended to, and does not, admit the correctness of the tax liability claimed by the Government; it is not intended to, and does not, waive,

or in any way change, the right of the taxpayer existent prior to the signing of this waiver to a refund of the proposed assessment herein shown, or of any tax previously paid, provided claims for refund are filed within the period prescribed by the limitations of the statute properly applicable thereto; and it is not intended to, and does not, waive, or in any [way] change, the right of the taxpayer existent prior to the signing of this waiver to sue in court should said claims be disallowed, provided said suits are begun within the period prescribed by the limitations of the statute properly applicable thereto."

7. December 2, 1927, the special advisory committee advised plaintiff that the agreement reached in the conference referred to in finding 6 had been confirmed by the Commissioner, and that the deficiency as set out in letter of September 19, 1927, had been revised to show a deficiency of $105,685.01. In such revision no change was made in net income, but the profits tax was computed under section 328 instead of on a statutory basis. The letter to plaintiff read in part as follows:

"You are advised that after careful consideration and review, your application under the provisions of section 328 of the Revenue Act of 1918 has been allowed. Your profits tax is based upon a comparison with a group of representative concerns which in the aggregate may be said to be engaged in a like or similar trade or business to that of your company.

"The result of the audit under the above-mentioned provisions is as follows:

| Computation of Tax | | |
|---|---|---|
| Profits tax under section 328 | | $142,744.55 |
| Net income | $546,996.33 | |
| Less: | | |
| Profits tax | $142,744.55 | |
| Exemption | 2,000.00 | |
| | 144,744.55 | |
| Subject to 10% tax | 402,251.78 | |
| Tax at 10% | | 40,225.18 |
| Correct tax liability | | 182,969.73 |
| Tax assessed | | 77,284.72 |
| Deficiency in tax | | 105,685.01 |

8. The deficiency of $105,685.01 for 1920 referred to in the preceding finding was assessed on the Commissioner's De-

cember, 1927, assessment list, and that amount, together with interest, $11,305.40, was satisfied as follows: $112,990.13 paid January 26, 1928; $3,972.86 and $27.42 satisfied by a credit from an overpayment for 1919 on schedules dated January 5, 1928, and February 4, 1928, respectively.

9. March 31, 1928, plaintiff filed a claim for refund of $150,000 for 1920 and assigned various grounds therefor, among which were the disallowance of the deduction of $10,000 on account of the subscription to St. Louis University, reduction of depreciation in the amount of $68,488.66, disallowance of the item of $171,789.83 on account of obsolescence of standing type and forms, and the reduction of invested capital in the amount of $235,478.60 on account of the cost of standing type and forms. The claim also stated that "the Bureau erroneously denied claimant's application for special assessment under sections 327 and 328 of the Revenue Act of 1918," and urged that special assessment be allowed. The claim further urged that the additional assessment against plaintiff had been collected after the statutory period for collection had expired. The claim was rejected in full October 5, 1928.

10. November 13, 1929, plaintiff filed a further claim for refund for 1920 of $150,000, which assigned substantially the same bases as were set forth in the first claim. The Commissioner considered the second claim as a request for a reopening and reconsideration of the first claim, and on April 26, 1930, advised plaintiff that such request was denied.

11. February 14, 1931, which was subsequent to the date on which the petition was filed in this proceeding, plaintiff filed a further claim for the refund of $181,400 for 1920, assigning as a basis therefor the same grounds which had been set out in the prior claims, except that the deduction for obsolescence of standing type and forms was increased from $171,789.83 to $370,135.47, and an addition to invested capital as determined by the Commissioner was claimed in the amount of $555,173.20 instead of $235,478.60 on account of standing type and forms.

12. Plaintiff began business about 1893 or 1894. Prior to 1902 or 1903 its type was set up from foundry type, and knocked down after a printing job therefrom, since it was too expensive to keep it standing.

In 1902 or 1903 the monotype machine was introduced and its use was begun by plaintiff. After plaintiff began to use the monotype machine, it also began to set up or build standing type and forms which were not immediately destroyed after a given job for which they were prepared, but they were stored and kept in order that they might be utilized in the event "repeat" orders were obtained for a like or similar job. As an aid to their location, a proof was taken of the standing type and forms as they were prepared and a record made thereon of their location on the shelves or in their storage places. In that manner a proof book was compiled in which each proof was placed. As standing type and forms were destroyed, proof sheets were removed from the proof book. The sheets in the proof book were used by plaintiff as a basis for determining the standing type and forms on hand, subject to an inventory check at irregular intervals. The standing type and forms as shown by the proof book also served as a basis for determining the amount of insurance to be carried thereon, which insurance was approximately $500,000 from about 1912 to 1916, and $1,000,000 in 1917 and 1918.

Plaintiff advertised the fact that it had standing type and forms on hand which had been prepared in connection with other jobs and that accordingly it could give a better price on another like or similar job and turn out the work more quickly than a concern which was not so advantageously situated.

Whether "repeat" orders would be obtained with respect to given forms could not be foretold, and plaintiff generally followed the practice of keeping the standing type and forms as long as there remained a fair possibility of their subsequent use in another order. When the railroads, for example, which were plaintiff's principal customers, definitely discontinued a particular type of form which had previously been printed by plaintiff, plaintiff would destroy, that is, knock down, the standing type and forms from which it was printed, and that would likewise be done by plaintiff from time to time when it appeared that little or no probability existed for the future use of any standing type and forms which it had on hand. And, again, one form might be superseded by another form, both of which were printed by plaintiff, in which event

the old standing type and forms would be knocked down and new type and forms set up. In some instances, for example, in tariff schedules, a substantial part of the form from which the original schedules were printed could be used when minor changes were made in the schedules, and that would be continued from time to time until it became expedient to print an entirely new schedule. In the foregoing manner standing type and forms were being set up from the inception of the use of the monotype machine in 1903 to beyond 1920, and at the same time old standing type and forms were being destroyed. The former, however, took place to a greater extent—at least until 1919—than the latter, with the result that there was a gradual increase in the quantity of standing type and forms on hand. Standing type and forms suffer no appreciable depreciation through use, and plaintiff has never set up depreciation thereon on its books or made a claim for a deduction from gross income in its income-tax returns on account thereof.

13. In 1910 plaintiff had an appraisal made of its standing type and forms, electrotypes, engravings, and other similar articles which showed quantities on hand and their cost of production as follows:

| | |
|---|---:|
| 27,011 pages passenger and freight rate schedules from B1 to B1340 at $8.00 per sheet | $216,088.00 |
| 4,679 pages R. R. and commercial miscellaneous jobs from C-169 to C-4848 at $10 per sheet | 46,790.00 |
| 52,059 cardboard bottoms for pages | 491.30 |
| 750,000 sq. ins. electrotypes at .03 | 22,500.00 |
| 70,000 sq. ins. zinc etchings (2,000 plates average 35 sq. ins. to plate) at .05 | 3,500.00 |
| 21,000 sq. ins. half-tones (1,000 plates average 21 sq. ins. to plate) at .15 | 3,150.00 |
| 1,095 pages 6-pt. foundry type on miscellaneous jobs | 4,927.50 |
| 1,000 boxes type sorts 6-8-10-12 pts | 2,000.00 |
| 500 packages type sorts 14-18-24-30 & 36 pts | 1,250.00 |
| 375 lbs. quads 12-18-24 & 36 pts | 12.50 |
| 17 cases wood type 340 characters | 289.00 |
| 917 railroad seals and commercial trade marks zinc and electros at .70 | 641.90 |
| 500 copper engravings | 1,000.00 |

The cost set out above represented metal cost of $67,261.60, which had previously been capitalized and appeared on plaintiff's books, and labor cost of $235,478.60, which had previously been charged to expense, and accordingly was not represented on plaintiff's books as an asset account. The labor costs did not include an additional item of $78,816, the labor

composition cost for the 750,000 square inches of electrotypes. That item was never entered on plaintiff's books either in connection with the appraisal or otherwise as a capital item, but it was charged to expense in the same manner as other labor costs. The standing type and forms set out in the appraisal were manufactured or set up from 1903 to 1910, inclusive; approximately 75 per cent. being manufactured from 1907 to 1910.

14. July 31, 1913, plaintiff made the following entry on its books:

| | |
|---|---:|
| "Rate schedules—electros, and type & forms a/c | $302,740.20 |
| To Electros a/c | $9,516.35 |
| To Metal a/c | 32,724.19 |
| To Type & Forms | 25,021.06 |
| To Con P. Curran personal a/c | 235,478.60 |

"The board of directors in meeting assembled voted to open a new account on the books of the company to be known as 'Rate Schedules—Electros & Type & Forms a/c' and ordered transferred by journal entry to the new a/c the amounts at this date charged to 'electros a/c, metal a/c, and type & forms a/c,' respectively, and also charge to this account and credit to the personal a/c of Mr. Con P. Curran the amount of difference between the total of these accounts as charged at this date ($67,261.60) to make the new account total the amount of appraisal as made by the American Appraisal Co., of Milwaukee, Wis., which total is $302,740.-20, making amount to be credited to Mr. Con P. Curran a/c, $235,478.60 and that these entries when made in the journal be duly approved by the 2nd vice president and the secretary by affixing their signatures as officers of the company to entry made in journal.

"A. S. Hart, Secretary.

"Florance J. Curran, 2d Vice President."

At the time the foregoing entry was made, the first three items appearing in such entry as credits appeared on plaintiff's books as asset items, representing the cost of the material for those items, but not including any labor costs. After the posting of the journal entry, the three old accounts were eliminated, and thereafter appeared in the asset account shown in finding 15. The last item, $235,478.60, represented the labor cost entering into the finished articles mentioned.

At the time the foregoing entry was made, additional stock was issued to plaintiff's president on account of the credit balance thus set up in his account on plaintiff's books.

15. The following account entitled "Standing Type & Plates, Forms, &c," appeared on plaintiff's books:

cordingly, but were merely notations made by the bookkeeper in closing the account at various intervals.

While the quantity of standing type and forms on hand, as well as the cost of labor entering therein, increased gradually from 1910 to December 31, 1919, no change was made in the account on ac-

| | Debits | | Credits |
|---|---|---|---|
| **1913** | | **1913** | |
| July 31 To electros a/c...... $ 9,516.35 | | Dec. 31 By inventory ...... $302,740.20 | |
| 31 To metal a/c...... 32,724.19 | | | |
| 31 To type & forms a/c...... 25,021.06 | | | |
| 31 To Con P. Curran...... 235,478.60 | | | |
| **1914** | | **1916** | |
| Jany. 1 To inventory ...... 302,740.20 | | Dec. 30 By inventory ...... 352,409.44 | |
| **1916** | | | |
| Dec. 30 To electros a/c for year 1916.... 7,858.94 | | | |
| 30 To material a/c for year 1916... 18,734.08 | | | |
| 30 To loss & gain—increase in value ...... 23,076.22 | | | |
| **1917** | | **1917** | |
| Jany. 1 To inventory ...... 352,409.44 | | Dec. 31 By inventory ...... 390,517.54 | |
| Dec. 31 To electros a/c for year 1917.... 4,195.15 | | | |
| 31 To loss & gain—increase in value ...... 33,912.95 | | | |
| **1918** | | **1918** | |
| Jany. 2 To inventory ...... 390,517.54 | | Dec. 31 By inventory ...... 408,888.16 | |
| Dec. 31 To material a/c—used during year ...... 18,370.62 | | | |
| **1919** | | **1919** | |
| Jany. 1 To inventory ...... 408,888.16 | | Dec. 31 L. & G....... 141,788.23 | |
| Feby. 25 To Station List Pub. Co....... 823.82 | | 31 Bal. to new ledger...... 283,576.46 | |
| 28 To S. I. Myerson Prtg. Co...... 15,652.71 | | | |

(New ledger)

| | Debits | | Credits |
|---|---|---|---|
| **1920** | | **1920** | |
| Jan. 1........................ $283,576.46 | | Dec. 31........................ $171,789.83 | |
| Dec. 31........................ 620.40 | | Dec. 31........................ 3,478.00 | |
| | | 31 inventory...... 85,188.64 | |
| | | 31........................ 23,740.39 | |
| | 284,196.86 | | 284,196.86 |
| **1922** | | | |
| Jan. 3 Inventory ...... 85,188.64 | | Dec. 30........................ 36,091.92 | |
| | | 30........................ 49,096.72 | |
| | 85,188.64 | | 85,188.64 |

The first three items in the above account, under date of July 31, 1913, were the ledger entries made for the purpose of setting up the amounts which were eliminated from these accounts by the journal entry set out in finding 14. The last item under date of July 31, 1913, represented labor costs in connection with standing type and forms on hand when an appraisal was made in 1910. The entries in the account "To Inventory" and "By Inventory" did not mean that inventories were taken and entries made ac-

count of the additional labor costs which were represented in the greater quantity of standing type and forms on hand.

16. Plaintiff followed the practice of charging the cost of metal, used in the preparation of its standing type and forms, to an asset account, on which no depreciation was taken, but the cost of composition (exclusive of "metal cost") was charged through its pay rolls to expense. The only variation from that practice occurred in connection with the journal entry referred to in finding 14.

There was little or no change in plaintiff's labor and material costs from 1910 to March 1, 1913, except for a slight increase, but the cost of both labor and material increased gradually after March 1, 1913, with the result that the cost of the standing type and forms on hand March 1, 1913, as well as at the beginning of 1917, 1918, 1919, and 1920, was in excess of that shown by the appraisal in 1910. There was also a gradual increase in the quantity of standing type and forms on hand from 1910 to the end of 1919, though, as shown in finding 15, plaintiff made no increase or change in the asset account because of the labor entering into its composition.

17. December 28, 1917, the Director General of the United States Railroad Administration took charge of the railroads of the United States under a proclamation of the President, and such control continued until March 1, 1920, when it was relinquished and the control of the railroads was turned back to their owners. The order relinquishing control was issued December 24, 1919. As heretofore stated, a large part of plaintiff's business came from the railroads and a substantial part of the standing type and forms which plaintiff had on hand had been used in printing various railroad forms.

In the beginning, forms, such as rate and tariff schedules and accounting forms which had been used by the railroads, were utilized by the Director General by placing a stamp thereon to indicate the change in control. Gradually, however, the Railroad Administration sought to standardize various forms which had been in use by the railroads, and as a result some of the forms previously used were superseded by other forms. Upon the return of the control of the railroads to their owners, some of the forms theretofore used by the Director General of the Railroads were no longer used.

18. At December 31, 1919, plaintiff made an examination of the standing type and forms on hand, and found that, as a result of the events outlined in finding 17 and of other causes which occurred in the normal operations of its business, approximately one-third of its standing type and forms were obsolete. It accordingly made a charge to profit and loss and a credit to the asset account of standing type and forms of $141,788.23. At December 31,

1920, plaintiff determined that approximately 60 per cent. of its remaining standing type and forms were obsolete for a like reason, and accordingly charged profit and loss and credited the standing type and forms account in the amount of $171,789.83. No change was made in the standing type and forms account because of metal in the standing type and forms which were determined to be obsolete, since the obsolete type and forms were knocked down and the metal used or held for use on future work. The record is insufficient to show when the standing type and forms which were determined in 1919 and 1920 to be obsolete were constructed and whether all or any part thereof represented standing type and forms included in the appraisal in 1910 and placed on the books as a capital item in 1913 or whether the obsolete items were those which had been constructed between 1910 and the date when they were determined to be obsolete and which had been currently charged to expense during that period.

19. In the audit of plaintiff's return and claims for 1920, the Commissioner excluded from invested capital $235,478.60, the item which was set up on plaintiff's books in 1913 on the basis of an appraisal made in 1910 to record the labor costs which entered into the standing type and forms on hand in 1910, but which costs had previously been charged to expense. Similar costs from 1910 to 1920, inclusive, were likewise charged to expense. Plaintiff had on hand at January 1, 1920, a larger quantity of standing type and forms than in 1910 and 1913, the cost of which was in excess of that on hand in 1910 and 1913, but the record is insufficient to show when that on hand at January 1, 1920, was set up and whether any part of it was in existence in 1910 and 1913. The record is likewise insufficient to show when any of the standing type and forms on hand at January 1, 1920, was last used or its probable future use.

20. Plaintiff occupied a reinforced concrete factory building which had been constructed about 1910 and transferred to it about October 1, 1920. It was still being occupied and used by plaintiff at the time of the hearing in this proceeding April 1, 1932, though at the latter date it was not in every respect a modern building for printing business purposes.

The automobile trucks used in plaintiff's business had a normal useful life of approximately four years; composing room machinery, press room machinery, and binding room machinery had a normal useful life of approximately ten years. During 1920 plaintiff's business was very active, and it was accordingly necessary to use much of its machinery and equipment twenty-four hours per day; that is, double the time during which a printing plant was ordinarily operated.

21. In its return for 1920 plaintiff made a claim for depreciation on buildings, machinery, and equipment as follows:

| | | | |
|---|---|---|---|
| Automobile truck............ | $4,821.90 | 25% | $1,205.47 |
| Furniture & fixtures: | | | |
| Office ............ $18,550.53 | | | |
| Factory ......... 15,915.25 | | | |
| Warehouse ...... 2,711.59 | | | |
| Chicago office.... 280.00 | | | |
| Washington office ............ 1,070.25 | | | |
| Toledo office..... 157.75 | | | |
| New Orleans office ............ 681.55 | | | |
| | 39,366.91 | 10% | 3,936.69 |
| Machinery & equipment: | | | |
| Composing room 151,867.46 | | | |
| Press room...... 146,303.07 | | | |
| Bindery ......... 76,020.42 | | | |
| | 374,190.95 | 20% | 74,838.19 |
| Stock room...... 2,802.48 | | | |
| General ......... 4,835.28 | | | |
| | 7,637.76 | 10% | 763.77 |
| Factory & office building... | 302,224.76 | 3% | 9,066.74 |
| Engine Room Mchy........ | 25,000.00 | 20% | 5,000.00 |
| Total .................................... | | | 94,810.86 |

22. In the examination of plaintiff's return by a revenue agent referred to in finding 4, the revenue agent recommended that the depreciation allowable for 1920 be reduced from $94,810.86 to $26,322.20, and also that invested capital be reduced at January 1, 1920, on account of alleged insufficient depreciation taken in prior years.

December 10, 1925, plaintiff protested the depreciation reduction as proposed by the revenue agent and submitted the following schedule as the amount allowable:

"The taxpayer deducted $94,810.86 as depreciation for the year 1920. The field agent allowed $26,322.20. The correct depreciation deduction for 1920 is $79,171.40, determined as follows:

| Item | Value to be depreciated, average for year | Rate | Amount of depreciation |
|---|---|---|---|
| | | *Percent* | |
| A. Bindery machinery ............. | $52,638.71 | 12 | $6,316.65 |
| B. Press room....... | 132,650.50 | 12 | 15,918.06 |
| C. Composing room stereotype machinery ........ | 6,408.23 | 12 | 768.99 |
| D. Composing room typesetting machinery ........ | 97,193.87 | 20 | 19,438.77 |
| E. Stock room machinery ........ | 2,802.48 | 12 | 336.30 |
| F. General machinery and equipment ........... | 4,835.28 | 12 | 580.23 |
| G. Furniture and fixtures ........... | 44,012.29 | 10 | 4,401.23 |
| H. Auto truck........ | 4,810.95 | 25 | 1,202.74 |
| I. Factory and office building ....... | 281,250.00 | 8 | 22,500.00 |
| J. Engine room machinery ........ | 12,500.00 | 20 | 2,500.00 |
| K. Additions and betterments (disallowed as expense in 1917) | 2,084.31 | 10 | 208.43 |
| L. Leasehold (Mar. 1, 1913 value)... | 210,000.00 | ........ | 5,000.00 |
| Total ....... | 851,186.62 | ........ | 79,171.40" |

23. The Commissioner considered the protest referred to in finding 22, and, after various conferences and further protest by plaintiff, allowed the amount of depreciation claimed in the schedule set out above except for the following items on which he made allowances as follows:

| | Amount claimed | Amount allowed |
|---|---|---|
| Factory and office building.. | $22,500 | $6,044.50 |
| Engine room machinery..... | 2,500 | 1,250.00 |
| Leasehold ..................... | 5,000 | 6,417.71 |

In computing the depreciation allowable on "Factory and office building" and "Engine room machinery," the Commissioner used rates of 2 per cent. and 5 per cent. instead of 8 per cent. and 20 per cent., since both assets were considered as having been owned by plaintiff for only three months during 1920.

The Commissioner rejected the recommendation of the revenue agent for a reduction of invested capital on account of depreciation which the revenue agent had computed in prior years but which had not been set up by plaintiff on its books.

The record is insufficient to show that the depreciation sustained by plaintiff for 1920 was greater than that allowed by the Commissioner as a deduction from gross income in 1920.

24. In 1920 plaintiff subscribed and paid $10,000 to an endowment fund for St. Louis University, a private institution supported by the Catholic Church. At that time plaintiff was obtaining certain printing business from St. Louis University and it made the subscription with the hope and expectation that it would not only aid it in retaining such business but also enable it to secure additional business from that institution and affiliated organizations. As an incident to such subscription plaintiff considered that the endowment fund was a worthy cause.

At that time St. Louis University's printing business amounted to approximately $100,000 annually, some of which was being done by plaintiff. Plaintiff obtained some business as a result of the subscription but not to the extent expected.

The amount of the subscription was deducted on plaintiff's return as advertising expense, but it was disallowed by the Commissioner in the audit of plaintiff's returns as well as in the consideration of the claims for refund heretofore referred to.

Leo H. Hoffman, of New York City (Robert W. Knox, and Hoffman & Knox, all of New York City, on the briefs), for plaintiff.

George H. Foster, of Washington, D. C., and Robert H. Jackson, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

GREEN, Judge.

The plaintiff seeks to recover an alleged overassessment and overpayment of its income and excess profit taxes for the year 1920. One of the defenses made is that these taxes were levied and collected by a special assessment made by the Commissioner under sections 327 and 328 of the Revenue Act of 1918 (40 Stat. 1093), and it is insisted that the courts are without jurisdiction to review his action.

Plaintiff made a return for the year 1920 and paid its tax accordingly. In 1925 an examination was made of plaintiff's return by a revenue agent and an additional tax recommended of $145,905.88. December 10, 1925, plaintiff protested against this determination and asked that the profits tax for 1920 be computed under the provisions of section 328 of the Revenue Act of 1918 because of "exceptional hardship" arising from abnormal conditions affecting both income and invested capital. In 1926 and in 1927 plaintiff renewed its request for a special assessment. September 19, 1927, the Commissioner advised plaintiff that a deficiency of $126,082.34 had been determined for 1920. Thereupon plaintiff applied to the special advisory committee of the Commissioner's office for further consideration of its case, which was granted, and the deficiency was determined to be $105,685.01. With reference to this decision, on November 8, 1927, plaintiff filed a waiver of the right to file a petition with the Board of Tax Appeals, and consented to the assessment and collection of a deficiency for the calendar year 1920 aggregating $105,685.01. This waiver, however, did not go very far, as it was subject to limitations which will be hereinafter noted.

December 2, 1927, the advisory committee informed plaintiff that its application for special assessment under the provisions of section 328 of the Revenue Act of 1918 had been allowed, and that the result of the audit fixed the deficiency in tax at $105,685.01. This deficiency for 1920 was assessed in December, 1927, and the amount with interest was paid by plaintiff.

March 31, 1928, plaintiff filed a claim for refund of $150,000 for 1920, assigning various grounds therefor, and stated that the Bureau had erroneously denied plaintiff's application for a special assessment. This claim for refund was rejected, as was also a later claim for reopening and reconsideration thereof.

This court held in Williamsport Wire Rope Co. v. United States, 63 Ct.Cl. 463, that it had no jurisdiction to review the assessment and collection of taxes made under what are commonly known as the special assessment provisions. Upon review

of this case by the Supreme Court (277 U.S. 551, 48 S.Ct. 587, 589, 72 L.Ed. 985), the decision of this court was affirmed and the Supreme Court said with reference to sections 327 and 328 that "the nature of the task which it [Congress] confided to the Commissioner, the methods of procedure prescribed, and the language employed to express the conditions under which the special assessment is required, all negative the right to a review of his determination by a court."

It was held, however, that such decisions might be reviewed by the Board of Tax Appeals. This conclusion has been followed in so many decisions that it would seem as if the question raised by plaintiff had been set at rest. Plaintiff, however, contends that, by reason of filing the waiver to which we have hereinabove referred, the courts acquired jurisdiction to review the Commissioner's determination; in other words, that the waiver somehow conferred jurisdiction upon this court to review the Commissioner's decision.

The waiver was not a contract, but merely a "unilateral waiver of a defense by the taxpayer." Stange v. United States, 282 U.S. 270, 276, 51 S.Ct. 145, 147, 75 L.Ed. 335. The plaintiff reserved in the waiver the right to sue, but the acceptance of the waiver by the Commissioner did not bind the defendant to permit suit to be brought in a manner not provided for by the statutes. It will be seen from the findings that, after the waiver was filed, the Commissioner reversed his original decision not to grant a special assessment and decided to make one. It would seem as if this left the whole matter in the same condition as if the waiver had not been filed except as to the limitation of time for making the assessment. But, in any event, plaintiff could not create the right to sue where it did not exist by stating that its right was reserved; nor could it confer jurisdiction upon this court by a statement in the waiver, when under the statute the court had no authority to consider the case; nor was there any advantage taken of plaintiff, as counsel intimates. The waiver, in our opinion, had no effect in the way of conferring jurisdiction upon this or any other court to review the Commissioner's decision under a special assessment, and, if the waiver did not confer upon the plaintiff the right to sue, it is clear that the courts have no jurisdiction to try the case presented.

If we now undertook to determine the amount of the proper assessment against plaintiff, necessarily we would have to review the action of the Commissioner and his computations made under the special assessment. As was said in Cleveland Automobile Co. v. United States (C.C.A.) 70 F.(2d) 365, 368: "To hold the special assessment reviewable on questions of value and income would tend to defeat the very purpose for which sections 327 and 328 were enacted. If considerations affecting net income are to remain open to review, the very basis upon which alone special assessment can be granted and made becomes a shifting one, and the assessment an idle gesture, binding the government possibly, but never the taxpayer."

Plaintiff calls attention to the fact that it does not seek to change the rate of the tax as fixed by the Commissioner under the special assessment, and contends that, as it does not seek to alter the rate, it is not precluded from showing that the Commissioner made errors in his calculation of the amount of net income. Several cases are cited in support of this contention of plaintiff. With one exception, the facts were quite different, and the courts did not have before them the question now involved. Some statements were made in McKeever v. Eaton (D.C.) 6 F.Supp. 697, that may seem to support this contention, but they do not accord with the rule laid down by the Supreme Court which has been followed by this court. In the case of Heiner v. Diamond Alkali Co., 288 U.S. 502, 506, 53 S.Ct. 413, 414, 77 L.Ed. 921, it was said that the allowance of a special assessment was a matter of administrative discretion and that "the Commissioner cannot make an administrative finding upon the question for decision under section 327(d) or that under 328 until he has determined the net income of the taxpayer."

And further the court said: "It is beyond the power of a court to usurp the Commissioner's function of finding that special assessment should be accorded, and equally so to substitute its discretion for his as to the factors to be used in computing the tax. The courts below were in error in adopting the rate chosen by the Commissioner and applying it to a net income other than that which he used in making his comparisons and arriving at the rate."

The plaintiff in this case is asking that the court reduce the amount of net income by making certain deductions the nature of which it is not necessary to set out. The net income is one of the "factors * * * used in computing the tax." We think the Supreme Court clearly laid down the rule that in special assessment cases a court cannot adopt the rate chosen by the Commissioner and apply it "to a net income other than that which he used in making his comparisons and arriving at the rate." The precise question here presented was passed upon by this court in Central Iron & Steel Co. v. United States, 4 F.Supp. 113, 6 F.Supp. 115, 79 Ct.Cl., 56, 88 (certiorari denied). This was a case in which a special assessment had been granted and the plaintiff sought to have the net income revised and a new computation made thereon. This court said: "When the taxpayer upon application obtains a determination of his tax under the special-assessment provisions he surrenders the right further to contest in court the correctness of the Commissioner's determination with respect to any of the factors necessary to his discretionary findings and the computation of the tax." Also that it was "without jurisdiction to decide the question presented and remand the case to the Commissioner for further exercise of his discretionary powers to determine whether or not the change in net income results in a greater or less profits tax."

As this court is without power to consider any questions as to whether the Commissioner should have made further deductions in the net income of plaintiff, it follows that plaintiff's petition must be dismissed, and it is so ordered.